1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

EASTERN DISTRICT OF CALIFORNIA

10

11  OTILIA SULLIVAN,

No.  2:12-cv-01173-TLN-DAD

12              Plaintiff,

13        v.

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

14  THE PRUDENTIAL INSURANCE
    COMPANY OF AMERICA; PHH
15  CORPORATION GROUP EMPLOYEE
    BENEFIT PLAN, AND DOES 1
16  THROUGH 300, INCLUSIVE,

17              Defendants.

18

19        Plaintiff Otilia Sullivan ("Plaintiff") is a 46-year old loan officer who was diagnosed with

20  a benign brain tumor in 2010.  She was treated with radiation therapy and subsequently became

21  blind in her left eye.  Plaintiff applied for long-term disability benefits available through her

22  employer's insurer, Defendant The Prudential Insurance Company ("Prudential").  Prudential

23  denied her claim finding she was not disabled from working in her regular occupation as defined

24  in its policy and upheld its decision in subsequent appeals.  Plaintiff brought this action against

25  Defendants, Prudential and PHH Corporation Group Employee Benefit Plan, pursuant to the

26  Employment Retirement Income Security Act ("ERISA").  This matter is before the Court on

27
28

1

cross-motions for judgment under Federal Rule of Civil Procedure 52.[1]

The Court has carefully considered the parties' arguments, and hereby finds that Plaintiff is disabled from working in her regular occupation as defined in the applicable policy. Therefore, for the reasons set forth below, Plaintiff's motion for judgment pursuant to Rule 52 is granted.

## I.   FINDINGS OF FACT[2]

### A.   Plaintiff's Occupation

1.      Plaintiff was born on May 28, 1967.  (PRU001065.)

2.      Plaintiff was employed by PHH Corporation ("PHH") as a loan officer.  Plaintiff commenced her employment with PHH in December 1995.  (PRU000615.)  Before working for PHH, Plaintiff was a loan officer for another company from 1990 to 1995.  (PRU000616.)

3.      As a loan officer Plaintiff worked with applicants for home mortgage loans.  Her duties included gathering, reviewing, and submitting completed mortgage loan applications.  Plaintiff's position required using a computer, communicating with customers and internal contacts, and working outside the office to meet with clients, including driving during the day and night time.   (PRU001157–59, 1280–81.)

4.      Plaintiff's compensation was based on commissions.  (PRU001157.)

### B.   Prudential's Long-Term Disability Plan

5.      Plaintiff was a participant in Group Insurance Policy Number 45479 ("the Plan") issued by Prudential to PHH.  (ECF No. 44 at 5.)

6.      The Plan has two definitions of disability.  In order to qualify as disabled under the first definition, the employee must be unable "to perform the ***material and substantial*** duties of

---

[1] The Court ordered these motions submitted on the briefs on July 8, 2013.  (ECF No. 54.)  While the Court regrets the delay in rendering its decision, the Court notes that the Eastern District of California is the busiest district in the nation, and the Ninth Circuit has held "district courts have a responsibility under the ERISA framework to undertake an independent and thorough inspection of an administrator's decision."  *Silver v. Executive Car Leasing Long-Term Disability Plan*, 466 F.3d 727, 733 (9th Cir. 2006) (citing *Mongeluzo v. Baxter Travenol Long Term Disability Ben. Plan*, 46 F.3d 938, 943 (9th Cir. 1995)).

[2] Defendants lodged the administrative record under seal on August 29, 2012, documents bates labeled PRU000001 through PRU001386.  In their briefing each side accuses the other of citing incomplete quotations and omitting significant portions of the record thus requiring the undersigned to recite several documents at length.

your **regular occupation** due to your **sickness** or **injury**, [] and you are under the **regular care** of a **doctor** . . ." (PRU001330.)

7. The policy defines material and substantial duties to mean "duties that[] are normally required for the performance of your regular occupation; and [] cannot be reasonably omitted or modified . . . ." (PRU001330.)

8. The policy also defines regular occupation to mean "the occupation you are routinely performing when your disability begins. Prudential will look at your occupation as it is normally performed instead of how the work tasks are performed for a specific employer or at a specific location." (PRU001331.)

9. Disability must begin while the employee is covered under the plan and an employee must be continuously disabled for an "elimination period" of 26 weeks.

> You must be continuously disabled through your **elimination period**. Prudential will treat your disability as continuous if your disability stops for 30 consecutive days or less during the elimination period. The days that you are not disabled will not count toward your elimination period. Your elimination period is 26 weeks. **Elimination period** means a period of continuous disability which must be satisfied before you are eligible to receive benefits from Prudential. . . . .

(PRU001331–32.)[3]

10. After two years of payments, the definition of disability becomes more restrictive and requires that the employee is unable to work in any gainful occupation. (PRU001330 ("After 24 months of payments, you are disabled when Prudential determines that due to the same sickness or injury: [] you are unable to perform the duties of any **gainful occupation** for which you are reasonably fitted by education, training or experience; and [] you are under the regular care of a doctor.").)

11. The policy states that "Prudential will assess your ability to work and the extent to which you are able to work by considering the facts and opinions from: [] your doctors; and []

_____

[3] Prudential's policy contains additional provisions regarding disability, including sickness and injury, and requirements that the employee be under a regular care of a doctor and have a certain percentage of monthly earnings loss. Said provisions are not directly at issue in the instant motions.

3

1    doctors, other medical practitioners or vocational experts of our choice."  (PRU001330.)

2    **C.**     **Plaintiff is Diagnosed with a Benign Brain Tumor and Commences Radiation**

3    **Treatment**

4         12.     In 2009, Plaintiff began experiencing left sided frontal and occipital headaches as

5    well as blurry vision of her left eye.  After consulting with an ophthalmologist, Dr. Palmer,

6    Plaintiff had a CT scan in January 2010, which revealed that Plaintiff had a tumor in the left side

7    of her brain near the optic nerve in her left eye.  (PRU000439, 719, 843.)   Plaintiff's tumor was

8    confirmed on February 11, 2010, by neurosurgeon Dr. James E. Boggan.  Specifically, Plaintiff

9    was diagnosed with left sphenoid wing and cavernous meningioma[4] with optic canal narrowing

10   and possible cavernous sinus and superior orbital fissure invasion.  (PRU000874.)

11        13.     According to Dr. Boggan's notes: "[Plaintiff] noted blurred vision, some pressure

12   sensation behind her left eye as well as that things appear to be less light.  She now cannot read.

13   She has a feeling that there is a film over her eye."  (PRU000874.)

14        14.     Plaintiff consulted with several doctors regarding the risks and benefits of both

15   surgery and radiation therapy to treat the tumor.  (PRU000418, 871.)

16        15.     **Plaintiff's Radiation Oncology Consultation, Therapy and Follow-Up:**

17   Plaintiff was evaluated on March 17, 2010, by Dr. Adam J. Huddleston, M.D. resident at UC

18   Davis Department of Radiation Oncology, and Dr. Richard Valicenti professor and Chair of the

19   Radiation Oncology Department.  (PRU000873.)  According to the progress notes:

20        •   Plaintiff complained of an "onset of ringing in her left ear and some periorbital

21            muscle twitching."  (PRU000867.)

22        •   Additionally, Plaintiff stated that "her vision continues to slowly decline and she

23            continues to have intermittent headaches.  She denies any seizure-like activity or

24            local numbness or weakness."  (PRU000867.)

25        •   "The patient is a well-developed, well-nourished female in no acute distress.  KPS

26   ──────────────
[4] Meningiomas are benign tumors of the meninges that can compress adjacent brain tissue.  Mark
27   H. Beers, MD, The Merck Manual of Diagnosis and Therapy 1921 (18th Ed. 2006).  Meninges
     are any of the three membranes that envelop the brain and spinal cord.  Merriam-Webster's
28   Collegiate Dictionary 724 (10th ed. 2001).

is 90%."[5]  (PRU000868.)

- "The natural history, prognosis, and treatment options regarding sphenoid wing meningioma with orbital and optic nerve involvement were discussed at great length with the patient and her husband."  (PRU000869.)

- "We discussed the risks and benefits of radiation therapy . . . which include but are not limited to fatigue, injury, cognitive dysfunction, hair loss, behavioral changes, and a secondary malignancy."  (PRU000869.)

16.    Plaintiff elected to proceed with radiation therapy, commencing March 29, 2010, and completed on May 6, 2010.  (PRU000844.)

17.    Plaintiff visited radiation oncology again on June 28, 2010.  Dr. Valicenti reported: "Since her completion of radiation therapy, Ms. Sullivan has done relatively well. . . . The patient denies nausea, vomiting, headaches, and seizure.  She also denies other complaints. . . . Over the past week, Ms. Sullivan has been complaining of slightly worsening vision in the left eye and

---

[5] The Karnofsky score, also known as the Karnofsky Performance Scale ("KPS") consists of "detailed criteria for measuring quality of life and functional abilities."  Considering Innovative Alternatives to Handling Cases of Adults with Special Conditions Under the Social Security Act, 29 J. Nat'l Ass'n Admin. L. Jud. 433, 464–65 (2009).

> Such criteria have proved useful in oncology, where performance status measures help to quantify a cancer patient's general well being.  These measures are scales of objective criteria for measuring quality of life in individuals with incapacitating disease.  Quality of life is the degree to which a person is able to function at a usual level of activity without or with minimal compromise of routine activities.  With cancer patients the measurement helps to determine whether a person can receive chemotherapy, if the adjustment of doses of medication is necessary, and to improve quality of life.  The Karnofsky score runs from 100 to 0.  In this system, 100 is "perfect" health and 0 is death. . . .

The following correlations exist in KPS: 100 - Normal, no complaints, no signs of disease; 90 - Capable of normal activity, minor signs or symptoms of disease; 80 - Normal activity with effort; some signs or symptoms of disease; 70 - Cares for self; unable to carry on normal activity or to do active work; 60 - Requires occasional assistance but is able to care for most needs; 50 - Requires considerable assistance and frequent medical care; 40 - Disabled; requires special care and assistance; 30 - Severely disabled; hospitalization is indicated but death not imminent; 20 - Very sick; hospitalization necessary; active supportive treatment necessary; 10 - Moribund; fatal processes progressing rapidly; 0 - Dead.  As noted *infra*, the parties dispute the implications of Plaintiff's various KPS scores.

1    mild left eye pain.  Otherwise, the patient is doing well.  The patient's KPS is 90 to 100%. . . .

2    The patient's left eye pain is very mild and the patient did not want any pain medications."

3    (PRU001048–49.)

4           18.    **Plaintiff's Neuro-Ophthalmology Consult:**  On June 29, 2010, Plaintiff met with

5    Dr. Xing, a resident in neuro-ophthalmology, regarding her symptoms post-radiation treatment.

6    Dr. Xing noted "Patient states that the vision has gotten worse in the left eye, especially after the

7    radiation treatment.  She has decreased depth perception and occasional dizziness.  Otherwise,

8    denies pain with eye movement, eye pain, diplopia, or other ocular complaints.  Denies weakness,

9    numbness, ataxia, or other neuro complaints."  (PRU001043.)

10          19.    Dr. Xing further noted:  "She is complaining of progressive diminished vision of

11   the left eye since 1/10.  It can be from optic canal compression vs. Tumor invasion.  However, we

12   will need to review imaging to determine whether there is further surgical options for her.  She

13   believes that since the radiation the vision is worse.  She has had some headaches and has some

14   pressure on the inside of the eye."  (PRU001044.)

15          20.    **Plaintiff's July 2010 Endocrinology Visit:**  Approximately one week later on

16   July 7, 2010, Plaintiff consulted with Dr. Browser at a UC Davis endocrinology clinic.  Dr.

17   Browser's notes disclose the following:

18          •   "Since [Plaintiff's radiation] treatment she has had fatigue beginning towards the

19              end of the treatment regimen, which has since worsened.  She feels overall low

20              energy.  She falls asleep easily in front of [the] tv, which is not normal for her.

21              She has been able to continue her job as well as taking care of 3 young boys."

22              (PRU000317.)

23          •   "She also notes intermittent dizzy spells which she describes as a pulsating in her

24              head followed by feeling of being drunk with mild lightheadedness.  Not

25              positional - happens sitting or standing.  No syncope,[6] palpitations.  Episodes

26              were brief, and were occurring every 5 minutes, but have since nearly resolved."

27

28   ─────────────────────
     [6] Syncope means faint.  Merriam-Webster's Collegiate Dictionary 1192 (10th ed. 2001).

6

(PRU000317.)

21.     **Plaintiff's September 2010 Follow-Up Visit to Radiation Oncology:**  On September 29, 2010, Plaintiff returned for a follow-up visit with Dr. Valicente and Dr. Huddleston in radiation oncology.  The notes disclose: "Since the patient was last seen in June she continues to have worsening vision in her left eye. The patient was seen in consultation by Dr. John Keltner with Neuroopthalmology which reveals left-sided optic nerve atrophy with scattered drusen[7] and severely generalized depression of her left eye field of vision.  She has been having worsening headaches while looking at the computer screen and feels as though this may be affecting her right eye.  She has been having what she describes as scintillating scotomas[8] in her peripheral vision on occasion.  She additionally reports severe difficulty with driving in dim light and given these continued and worsening symptoms, feels as though she can no longer work.  She denies any symptoms of nausea, vomiting, severe headaches, or seizure-like episodes." (PRU000311.)

22.     Under the physical examination section, Dr. Huddleston noted: "The patient is a well-developed, well-nourished female in no acute distress.  KPS is 80-90%."  (PRU000311.)

23.     Based on his assessment that Plaintiff had worsening vision in the left eye and mild right eye pain, Dr. Huddleston concluded: "We agree that at this time the patient likely is unable to perform her work duties and therefore we have filled out the appropriate paperwork for disability."  (PRU000311.)

24.     Plaintiff ceased work on October 15, 2010.  (PRU001183.)

25.     **Dr. Valicenti's Statement of Plaintiff's Disability:** Plaintiff's radiation oncologist, Dr. Valicenti, signed Plaintiff's employee disability statement.  (PRU001063–66.)[9]

---

[7] Drusen are small subretinal yellow-white spots.  The Merck Manual of Diagnosis and Therapy 871 (18th Ed. 2006).
[8] Scintillating scotomas are flashing lights.  The Merck Manual of Diagnosis and Therapy 873 (18th Ed. 2006).
[9] It appears that Dr. Valicenti completed two statements, one dated September 29, 2010, and the other dated October 25, 2010.  The statement dated September 29, 2010 states that Plaintiff would be able to return to "any other job" on a part-time basis.  (*Compare* PRU001063 and 1064.)  Both statements indicate that Plaintiff would not be able to return to her current job.

The statement includes sections related to Plaintiff's diagnosis, serious condition, history, treatment, progress, and ability to return to work.

- Under "diagnosis" the statement reads: "Retroorbital headaches progressive vision loss orbital tissue." (PRU001063–64.)
- With respect to "objective findings" the statement reads "MRI, left sphenoid wing meningioma." (PRU001063–64.)
- Under "prognosis" a box was checked indicating that Plaintiff was prevented from performing her job. (PRU001063–.)
- With respect to "duties" the statement reads that Plaintiff is incapable of "driving in dim light or darkness" and "reading computer screen all day." (PRU001063–64.)
- Dr. Valicenti also noted that Plaintiff could not drive during the evening or spend extended periods of time on the computer. (PRU001063–64.)

26.     Dr. Valicenti also wrote a letter dated December 3, 2010, in which he opined that due to the demand and stress level in Plaintiff's current position, she was unable to return to work in her current capacity. (PRU0001067 ("Ms. Otilia Sullivan has been under my care since March of 2010 and I am writing this letter on her behalf. Due to the demands and stress level of Ms. Sullivan's current position, she is unable to return to work in her current capacity. The patient requires less stressful work and time in front of a computer screen in an effort to diminish headaches and progressing vision deterioration.").)

27.     **Plaintiff's December 2010 Endocrinology Visit:**  Plaintiff consulted with endocrinology doctor Dr. Emiley Chang M.D. under the supervision of Dr. Swisloki on December 16, 2010. (PRU000646–48.)  The endocrinologists noted:

- Plaintiff's chief complaint was "fatigue and intermittent dizziness." (PRU000646.)
- "[Plaintiff] states she has gone on disability since mid-October from her high stress banking job, and since then most of her symptomology has basically improved or resolved." (PRU000647.)

8

- She thinks that her vision issues were [] sequelae[10] of the radiation treatment (eg. spots, eye pain) and are also resolved; she remains legally blind in her left eye." (PRU000647.)

- "No dizziness or lightheadedness, no chest pain[.]"  (PRU000647.)

- "Neuro: Decreased headaches, previously left posterior head in occipital region." (PRU000647.)

- "Symptoms of fatigue and dizziness resolved after going on disability, likely stress-related.  No evidence of pituitary involvement by tumor at this time . . . ." (PRU000647.)

28.     **Plaintiff's December 20, 2010 Ophthalmologic Follow-Up Visit:**  Plaintiff was examined by her ophthalmologist, Dr. Palmer, again in December 2010.  Dr. Palmer memorialized his findings via letter dated January 19, 2011: "I examined Otilia Sullivan in my office on January 25, 2010.  At that time, I ordered a CT scan and discovered a tumor near the optic nerve in her left eye.  She had functional use of the left eye at that time.  I again examined Mrs. Sullivan on December 20, 2010 after she had completed radiation treatment. After treatment her optic nerve appeared pale and unhealthy, and she has no functional use of her left eye." (PRU000439.)

29.     **Plaintiff's January 2011 Radiation Oncology Follow-Up Visit:**  Plaintiff had a follow-up visit with Dr. Valicenti on January 19, 2011.  (PRU000643.)  Dr. Valicenti's notes disclose the following:

- "Since the patient was last seen in September, she has done relatively well. Her headaches have significantly improved. She is no longer working at a computer desk job and she has found a direct correlation between stress levels and headaches."  (PRU000643.)

- Regarding her vision, she continues to have left-sided vision loss secondary to optic nerve atrophy, and has been evaluated by Dr. Keltner with

---

[10] Sequelae are the after effects of a disease or injury.  Merriam-Webster's Collegiate Dictionary 1065 (10th ed. 2001).

Neuroophthalmology." (PRU000643.)

- "The patient reports some difficulty with left-sided hearing loss that is new. She reports that she uses the right ear to listen to the phone as she has difficulties when using the phone in the left ear. This has been gradually progressing over the course of the last six months and became noticeable to the patient this past month."

- "She denies any new nausea or vomiting or seizure-like episodes. She is otherwise able to perform her routine daily activities with the exception of work which she is currently working with her manager to determine a role that she could continue that does not involve excessive computer time." (PRU000643.)

- "PHYSICAL EXAMINATION: In general, this is a well-groomed, well-nourished female in no acute distress. KPS is 80%. . . . According to the patient, with her left eye she is able to discern objects but everything in her visual field is blurry." (PRU000643–44.)

- "IMAGING DATA: We personally reviewed the patient's MRI from 12/15/10, and compared it with the previous MRI that was obtained on 09/22/10 and there d[o]es appear to be an interval decrease superiorly of approximately 2 to 3 mm of the cavernous sinus lesion, as compared to before." (PRU000644.)

- "RECOMMENDATION: At this time the patient's vision deficits in the left eye appear to have stabilize[d] and are unlikely to worsen further, although that possibility has been discussed with patient. In the meantime, she has developed a new onset of left-sided hearing loss, which we would like to have evaluated formally with audiometric testing. . . . [W]e do not suspect that the patient's hearing loss is secondary to the radiation therapy, although it is always a possibility." (PRU000644.)

30.     **Plaintiff Advises Prudential of Her Brain Tumor:** Plaintiff filled out Prudential's long-term disability claim form in January 2011. Under disability information the claim reads as follows: "I have a brain tumor, radiation has caused blindness + headaches." (PRU001062.)

31.     On February 25, 2011, Plaintiff called Prudential and advised that she was diagnosed with a benign brain tumor in January 2010 and completed radiation from March 2010 through May 2010.  She advised Prudential via telephone that she could not see straight or focus and reported fatigue.  She advised that she was looking for different work options within her company because the stress level had affected her along with the demand levels of her eyes.  (PRU001182–84.)

32.     Prudential's telephone logs further disclose: "[Plaintiff] said that at her job, she meets with a lot of clients after work and was having a hard time driving, her depth perception is gone.  She was more and more frequently starting to see spots.  She can't see through her left eye.  Her doctor felt that the strain on her right eye was too much due to compensation.  [Plaintiff] was having floaters and couldn't see straight and focus.  Also talking on the phone was giving her headaches.  [Plaintiff] tried to only speak on speaker phones when possible.  Her fatigue just increased. . . ."  (PRU001183.)

33.      "Restrictions and Limitations: . . .  The visual issues and the stress are contributing to her headaches.  Driving when the sun goes down is problematic for her."  (PRU001183.)

34.      "Describe a typical day: [Employee] has a lot of medical apts.  [Employee] has been trying to do anything she can to shrink the tumor.  [Employee] sees a natural medicine doctor.  [Employee] wakes up early around 6:00.  [Employee] has 3 children.  [Employee] takes them to school and picks them up.  [Employee] will do household laundry.  15, 13, and 11 her kids can help.  [Employee] can go to the grocery store.  [Employee] tries to limit computer use and reading.  She tries to avoid stressful situations even when her kids are unruly it gives her a headache.  Driving: [Employee] drives during the day."  (PRU001184.)

35.      "Return to work: [Employee] was looking at different work options within her company but now she says it's obvious that the stress level has affected her along with the demand levels of her eyes.  [Employee] worked there for 16 years.  [Employee] is not sure what to do at this point as she doesn't want to make her condition worse."  (PRU001184.)

**D.** **The Social Security Administration Initially Denies Plaintiff's Claim**

36.     By letter dated March 30, 2011, the Social Security Administration ("SSA") denied Plaintiff's claim for Social Security benefits.  (PRU000466.)  Although the SSA found that Plaintiff was disabled from her past work, it found that she was not disabled from working.  (PRU000466 ("Based on a review of your health problems you do not qualify for benefits on this claim.  This is because you are not disabled under our rules.").)

37.     The SSA explained as follows:

- "We have determined that your condition is not severe enough to keep you from working.  We considered the medical and other information, your age, education, training, and work experience in determining how your condition affects your ability to work."  (PRU000466.)

- "You have said you were unable to work because of: I have a meningioma brain tumor: the tumor causes headaches; Due to radiation I am legally blind in my left eye; Due to the radiation I have hearing loss in my left ear; when under stress I see spots in my right eye and have sharp pain behind eye."  (PRU000466.)

- "Records indicate your condition has responded to treatment.  Though you have lost sight in one eye, the evidence shows you have satisfactory vision in your other eye with correction.  Though you have a decrease in your hearing, the evidence shows you are able to hear and understand conversation at normal volumes."  (PRU000466.)

- "We realize that your overall condition prevents you from returning to your past work, but it does not prevent you from working.  Based on your age, education, past work history, and overall health, we have concluded that you have the ability to do less-physically-demanding work which avoids precise vision and hearing, and hazards such as heights and machinery."  (PRU000466–67.)

38.     The SSA letter included their definition of disability: "You must have the required work credits and your health problems must: [] keep you from doing any kind of substantial work (described below), and [] last, or be expected to last, for at least 12 months in a row, or result in

1   death." (PRU000467.)

2   **E.**   **Prudential Evaluates Plaintiff's Claim for Long-Term Disability Benefits**

3   39.   After receiving Plaintiff's claim for disability benefits, Prudential calculated

4   Plaintiff's earnings.  Plaintiff's annual salary was $219,073.67 i.e., $18,256.14 per month.

5   (PRU001167–68.)

6   40.   **Nurse Gillis's March 30, 2011 Review:** On March 30, 2011, a registered nurse

7   for Prudential, Judy Gillis, reviewed Plaintiff's claim and medical records.  Nurse Gillis noted

8   that there were "[i]nconsistencies . . . in the claimant's reported severity of symptoms for

9   instances she needs to decrease her stress level, and eye demand."  (PRU001165.)

10   41.   Nurse Gillis also noted that "[t]he objective evidence notes she has left sided

11   vision loss due to optic nerve atrophy/ stabilized. There is [a] decrease in her meningioma since

12   completion of radiation. . . . Stress is listed in file there may be a [behavioral health] component

13   to this claim which is contributing in part or in whole to her recovery from the physical aspects of

14   any physical condition."  (PRU001166.)

15   42.   Nurse Gillis further noted that when Plaintiff was diagnosed in January 2010,

16   Plaintiff was capable of working.  (PRU001165; *see also* PRU001166 ("Given the fact she

17   worked 10 months after being diagnosed with benign left cavernous sinus mass meningioma with

18   complaints of left optic nerve neuropathy-completed radiation treatment from 03/29/2010 to

19   05/06/2010 and was capable of working, this file would benefit from a clinical [file review] to

20   review the multiple records and to determine current capacity for her reported optic nerve

21   atrophy.").)

22   43.   At that time, Nurse Gillis concluded that Plaintiff's capacity was unclear.

23   (PRU001166 ("At this time it is not clear what has changed since she was diagnosed with

24   meningioma, left sphenoid wing with left optic neuropathy with loss of vision & field dating back

25   to 01/2010 and was capable of working.").)

26   44.   **Prudential Informs Plaintiff That Her Claim is Approved:**  On March 30,

27   2011, Plaintiff called to inquire about the status of her long-term disability claim.  In response, a

28   Prudential representative told Plaintiff that "[the representative] had met with our medical dept

1  and we would be approving her claim, however, they had not documented the file yet."

2  (PRU001211.)  The representative went on to inform Plaintiff that "once our determination is

3  made, I will be sending her a letter . . . ."  (PRU001211–12.)

4       45.     On March 31, 2011, Nurse Gillis amended her assessment of Plaintiff:

5        •   "Records dating back to 01/2010 to current – optic nerve atrophy diagnoses has

6           been consistent.  She likely was able to function with her [sic] optic nerve atrophy

7           dating back to 01/2010 but recently her symptoms were affecting her at work.

8           (PRU001162.)

9        •   "Per RN research on Medline Plus: optic nerve atrophy is damage to the

10           opticnerve [sic].  The optic nerve carries images of what we see from the eye to the

11           brain.  Damage from optic nerve atrophy cannot be reversed.  Symptoms may

12           include : Blurred vision, reduced peripheral vision, Abnormal color vision, Poor

13           construction of the pupil in light.  Decreased brightness in one eye relative to the

14           other[.]"   (PRU001163.)

15        •   "It is medically reasonable at this time she would have limitations with reduced

16           peripheral vision, decrease color vision with decreased brightness in her left eye

17           with poor construction of pupil inlight [sic].  The claimant is driving which

18           suggest[s] she is not impacted by her blurred vision."  (PRU001163.)

19       46.     Prudential's subsequent notes indicate an initial decision to approve Plaintiff's

20  long-term disability benefits.  (PRU001160 ("TYPE: Initial LTD Decision  REASON:  LTD

21  approval").)  It also appears that Prudential scheduled payments for two years—from March 2011

22  to March 2013.  (PRU001161 ("DCT to approve benefits to end of month prior to A/O 3/31/13");

23  PRU001162 ("They will code the system through 3/31/13 and fill in payment dates.").)

24       47.     Prudential's notes also indicate additional approval would be required for

25  exceeding an "authority limit."  (PRU001162 ("Over DCT authority limit, referring for

26  approval.").)

27       48.     Nurse Gillis wrote that no further steps were necessary and referred the matter to a

28  vocational rehabilitation specialist.  (PRU001163–64.)  By letter dated April 1, 2011, a Prudential

Vocational Rehabilitation Specialist contacted Plaintiff informing her about Prudential's rehabilitation program to assist with returning to work.  (PRU001308 ("This program may include, but is not limited to the following services: . . . Vocational evaluation to determine how your disability may impact your employment options . . . .").)  The letter further recounted "it was mentioned that you and your manager at PHH may be attempting to accommodate your disability to allow you to return to work in some capacity. I would be able to offer financial support for accommodations that involve adaptive equipment or software."  (PRU001308.)

49.     **Further Review of Plaintiff's Claim by Prudential:**  On April 4, 2011, Prudential requested further review of Plaintiff's long-term disability claim.  (PRU001156 ("Referring file back to RN to clarify if [employee's] limitations would impact her at 20 inches or less?").)

50.     In response on the same day, Nurse Gillis reviewed Plaintiff's file and concluded, "[p]er RN online research - there is no information reviewed that the claimant would have limitations regarding her vision at 20 inches or less - this would correlate with the fact she continues to drive & she is able to perform her routine activities with expectation of work."  (PRU001155.)

51.     On the same day, Plaintiff called again to inquire regarding her long-term disability claim.

52.      The Prudential representative told Plaintiff that it was unclear how her restrictions and limitations prevent her from performing her occupation, particularly because Plaintiff was still driving.  (PRU001214.)  In response, Plaintiff informed Prudential that "most of her customers wanted to meet with her after business hours as they work during the day."  (PRU001214.)

53.     Prudential reiterated that it would be approving her claim but had concerns about inconsistencies with Plaintiff's ability to drive and with how her restrictions and limitations prevented her from doing work that required clarity of vision at 20 inches or less.  (PRU001214.)

54.     **Dr. John LoCascio Requests Further Review of Plaintiff's Claim:**  On April 5, 2011, Prudential's Medical Director, Dr. John LoCascio M.D., who is board certified in internal

medicine, reviewed Plaintiff's claim. He wrote: "I have discussed this file in Claim Discussion format with Judy Gillis RN. I read all the SOAP notes and a letter from the [attending physician]. Ms. Sullivan is objectively stable from the point of view of her tumor and radiation. She is essentially monocular and should be able to function normally except for minor accommodation. From the perspective of the headaches she reports increasing symptoms despite objective stability after 12 months. She still drives her car but says she cannot function well at work. Her psychological status is unclear to me." (PRU001151–52.)

55. Based on his review, Dr. LoCascio requested a full file review by Nurse Gillis. (PRU001151 ("Based on doc walk in with RN, sending claim for a full file review to understand consistency and creditability [sic]."); PRU001152 ("Plan: full RN review with CD with me to follow."); PRU001145 ("After further discussion with Dr. LoCascio and DCM, from the perspective of the headaches she reports increasing symptoms despite objective stability after 12 months – this clinician will do a complete clinical FR.").)

56. On April 5, 2011, Nurse Gillis completed the file review in which she noted the following:

- "Inconsistencies are noted in this file, for instance it should be noted that Dr. Huddleston did not see[] the claimant until 6 months later on 09/2010 after [h]is initial consultation 03/17/2010. As a consequence it is unclear on what basis he is claiming she is likely unable to do her job- the impairment he provided in his 09/2010 are based solely on claimant's subjective complaints that she does not feel she can work any longer. At the time of her initial visit with Dr. Huddleston 03/2010 there is no change in examination findings." (PRU001148.)

- "The claimant reports disability statement 01/18/2011 -last day worked 10/05/2010. 'I have a brain tumor, radiation has caused blindness & headaches.' This is not consistent with examination - self limiting only. She is objectively stable from her tumor and radiation." (PRU001149.)

- "There no consistent [sic] reports of headaches - example 03/17/2010 she had complaints of intermittent headaches. Three months later 06/29/2010 she states

16

has had some headaches, at the time she stopped working 3 months later c/o headaches." (PRU001149.)

- "No medications prescribed for headaches -in fact 06/2010 she is not taking any pain meds. At the time she stopped working 09/29/2010, she denies severe headaches. This suggest[s] to this clinician she is not impacted by her complaints of infrequent headaches - there is no indication of consistencies of severity [sic] headaches in records, there is no evidence of debilitating headaches." (PRU001149.)

- "Likewise per her claimant's disability statement which she reports cannot work due to headaches (and blindness) is subjective reporting only and is self limiting with no evidence to support severity of symptoms." (PRU001149.)

- "Records are consistent with a Karnofsky performance status scoring of 80-100% which is normal with no complaints, no evidence of disease can do normal activity, minor signs or symptoms/ some signs or symptoms of disease. This is consistent with unremarkable exam findings." (PRU001149.)

- "Furthermore advocacy letter from Dr. Valicenti 12/03/2010 'due to demands & stress levels of her current position she is unable to work in her current capacity. She requires less stressful work & time in front of computer screen in effort to diminish headaches & progressing vision loss.' This is not consistent with exam findings as outlined above." (PRU001149.)

- "Stress is noted to be a factor in records submitted –the claimant reports in her most recent phone call stress adds to her headaches yet her mental status exams are normal." (PRU001149.)

- "Interesting one would expect while undergoing her radiation treatment the emotional stress from being diagnose[d] with meningioma she would have increases headaches on exams – this is not the case.  This brings a question of credibility to her subjective complaints." (PRU001150.)

- Nurse Gillis concluded: "[t]here are inconsistencies as noted above with the

17

claimant's self reporting.  The objective evidence notes she is objectively stable from the point of view of her tumor and radiation. She is essentially monocular and should be able to function normally except for minor accommodation.  The claimant reported since going on disability her fatigue & dizziness resolved- [attending physician] opines likely stress related. As outlined above the description of the claimant's symptomatology are very likely contributed by a [behavioral health] component with lack of medical evidence to support symptomatology. The claimant is fully functional, continues to drive- which demonstrates she had concentration capacity - with normal mental status exam." (PRU001150.)

57.     Nurse Gillis further wrote that "No next steps are necessary – she appears to be capable to returning [sic] to work at this time – her inability to work appears to be self-limiting." (PRU001151.)

58.     Dr. LoCascio concurred with Nurse Gillis's file review.  (PRU001142 ("I agree that despite impairment from the known tumor and radiation, she is clinically stable and self-reports essentially normal activity in the community, which is consistent with the normal expectations for functional status related to these findings, assuming expected and reasonable self-accommodation.").)

**F.      Prudential Denies Plaintiff's Claim for Disability**

59.     By letter dated April 6, 2011, Prudential denied Plaintiff's claim for long-term disability benefits.  (PRU001306 ("After a thorough evaluation of the above information, we have determined that you do not meet the definition of disability as defined above.  Therefore, we have denied your claim.").)

60.     The letter recounted Nurse Gillis's and Dr. LoCascio's reasons for denial: "Although we note that you have subjective complaints of headaches, the objective evidence notes you are stable from the point of view of your tumor and radiation.  We note that you are essentially monocular and should be able to function normally except for minor accommodation. It is noted that since going on disability, your fatigue and dizziness have resolved.  Also, as you

18

1   continue to be able to drive, this demonstrates that you have concentration capacity with normal

2   mental status exam."  (PRU001306.)

3   **G.      Prudential's Conduct After Its Denial of Plaintiff's Claim**

4         61.    Prudential received an additional letter of support for Plaintiff signed by Dr. Yi, a

5   resident doctor in the UC Davis Department of Radiation Oncology.[11]  The letter stated: "Ms.

6   Otilia Sullivan has been under our clinic's care since March of 2010 and was successfully treated

7   but with severe and persistent residual symptoms, precluding her from safely working at a full-

8   time level. The symptoms she is currently experiencing are neurologic in nature, which are

9   unlikely to resolve with time, and include but are not limited to headaches, dizziness, visual

10  disturbances particularly in the left eye with depth perception and low-light perceivable

11  distortions. These symptoms cause her the inability to drive safely at night which would be

12  required for her to commute back and forth to work on a daily basis. This in addition would

13  present as a potential public safety issue.  Additionally, due to the demands and stress level of

14  Ms. Sullivan's current full-time job position, she is unable to return to work in her current

15  capacity."  (PRU000483.)[12]

16        62.    Nurse Gillis discussed Dr. Yi's letter with Dr. LoCascio and concluded that the

17  letter did not change Prudential's assessment of Plaintiff's capacity.  (PRU001142–43 ("I agree

18  that despite impairment from the known tumor and radiation, she is clinically stable and self

19  reports essentially normal activity in the community, which is consistent with the normal

20  expectations for functional status related to these findings, assuming expected and reasonable

21  self-accommodation.").)

22        63.    On April 7, 2011, Plaintiff called Prudential to follow up on Prudential's denial of

23  her claim.  Among other things, Prudential informed Plaintiff that her file had inconsistencies

24  including that she had no prescribed medications despite her report of headaches.  Plaintiff told

25  _____

26  [11] Dr. Yi's letter is dated April 5, 2011, but Prudential states in its briefing that Plaintiff sent the
    letter on April 6, 2011.  Therefore, it appears that Prudential did not receive this letter until after

27  its denial of Plaintiff's claim.
    [12] The content of Dr. Yi's letter is repeated by Dr. Huddleston in a letter dated the same day.  (*See*

28  PRU000484.)

1 Prudential that she "tries not to take a lot of pharmaceutical medications."  (PRU001219.)

2       64.     On April 8, 2011, Prudential's vocational rehabilitation specialist entered a note

3 that stated: "[return to work] not appropriate given determination of liability. . . . As [employee]

4 is not considered disabled from own occupation and no liability has been established,

5 continuation of any [return to work] services is not appropriate."  (PRU001140.)

6 **H.**      **Plaintiff Appeals and Prudential Reviews Additional Records**

7       65.     By letter dated April 26, 2011, Plaintiff appealed Prudential's denial of her long-

8 term disability claim.  (PRU000440–449.)[13]  With the appeal and through subsequent

9 communications, Prudential received additional records.  (*See, e.g.,* PRU000283–84, 286, 303–

10 04, 482, 590, 593–94.)

11       66.     **Plaintiff's April 2011 Primary Care Physician Visit:**  Plaintiff was examined by

12 her primary care physician Dr. Cafarella on April 8, 2011.  (PRU000481–82.)  Dr. Cafarella

13 noted in her report:

14     •   "[Plaintiff] has continued to have quite a few problems. . . . She is having daily

15         headaches that she rates as a 5/10 on a good day, up to an 8/10 on a bad day.  She

16         is taking Advil 800 mg 1-3 times a day on average for her pain.  She has constant

17         pressure in the medial corner of her left eye that seems to be getting worse. She

18         has also been having more muscle twitches and spasms, and so there is a concern

19         that the meningioma may actually be growing."  (PRU000481–82.)

20     •   "She has also been having quite a bit of stress and anxiety lately regarding her

21         disability application, which supposedly was denied, as there had not been much

22         documentation of her persistent symptoms by Dr. Valicente's office.

23         (PRU000482.)

24     •   "She had an episode last night where she thought she was sleeping, and her

25

---

26 [13] After receiving Plaintiff's appeal, on May 10, 2011, Prudential claimed that the appeal letter referenced several treatment providers of which it was previously unaware.  (PRU001139 (stating

27 that Prudential was not previously aware of Plaintiff's primary treating physician, Dr. Caferella, natural medicine specialists Dr. Larrow and Dr. Raithel, neurosurgeon Dr. Boggan,

28 ophthalmologist Dr. Palmer, or neuro-ophthalmologist Dr. Keltner).)

husband woke up because the bed was shaking. Her arms and legs were twitching quite a bit. When she woke up, she continued to do that, but it gradually resolved over an hour or so." (PRU000482.)

- "She continues to report problems, including varied headaches, pressure in left eye, stress, anxiety, bulging proptosis.[14] She reported one episode where she was shaking, etiology undetermined. She takes Advil intermittently for pain; she was given Voltaren instead of advil for pain control. . . ." (PRU000482.)

- "[Plaintiff] denies any further vision loss. No vomiting or nausea. No other focal neurologic symptoms." (PRU000482.)

67. **Plaintiff's April 2011 MRI:** On April 12, 2011, Plaintiff was subject to a follow-up MRI. The examining physician, Dr. Bobinsky, stated that the tumor was compressing the internal carotid artery. "Meningioma [i.e., the tumor] results in marked encasement of the cavernous segment of left [internal carotid artery] with resulting compression of the vessel." (PRU000487). Dr. Bobinsky opined that this resulted in "markedly decreased" blood flow through that artery. (PRU000487 ("Angiographic images of the brain demonstrate markedly decreased flow related enhancement in the left internal carotid artery, especially in its cavernous segment.").)

68. **Plaintiff's April 2011 Neurological Surgery Visit:** On April 13, 2011, Plaintiff consulted with Nurse Practitioner Julie Jorgenson in the UC Davis Department of Neurological Surgery. Nurse Jorgenson noted:

- "[Plaintiff] has constant headaches and pressure on the left side of her head. Pain score today is 5 (scale of 1-10). She also has left orbital pressure which causes constant pain. She also has unpredictable episodes of vertigo lasting up to 10 seconds up to several times per week. She also has floaters in her right eye for which Dr. Keltner has been treating her. The last concern is a 2 month history of

---

[14] Proptosis is protrusion of the eyeball. The Merck Manual of Diagnosis and Therapy 876 (18th Ed. 2006).

pulsatile tinnitus[15] in her left ear.  This is worse with forward flexion and she no longer has hearing in the left ear.  She has tried and failed the following analgesics:  Motrin, diclofenac, amitriptyline, Tylenol, and Aleve.  She is unable to take Vicodin as it causes excessive sedation." (PRU000291.)

- "She has been unable to work due to the difficulty reading with monocular vision with acuity challenged by floaters, orbital pressure, pulsatile tinnitus, and ongoing headaches." (PRU000291.)

- "[Plaintiff had m]arked decreased flow in left internal carotid artery from compression by meningioma, likely caused pulsatile tinnitus." (PRU000293.)

69. **Plaintiff's April 2011 Examination With Dr. Keltner:**  On April 27, 2011, Plaintiff was examined by Dr. Keltner from UC Davis Health System's Department of Neurology, Neurosurgery and Ophthalmology.  Dr. Keltner reviewed Plaintiff's MRI scan and agreed with the radiological interpretation of a stable meningioma and decreased blood flow in the left internal carotid artery.  (PRU000591.)

70. Dr. Keltner's notes further disclose the following:

- "Persistent left cavernous sinus meningioma, no interval increase since initially diagnosed.  This likely explains both the left eye proptosis, left eye pressure, and headaches." (PRU000592.)

- "New onset vertigo." (PRU000592.)

- "Patient is having a lot of difficulty with pain, floaters, and visual difficulty.  She finished radiation to the tumor May 2010.  Patient is currently having problems with disability issues.  She was place[d] on disability October 15, 2010.  She has a state and short disability."   (PRU000592.)

- "Patient continues to have problems with reading because of using the OS [i.e., left eye] continues to track.  As a result she has pain and discomfort with this effort." (PRU000592.)

[15] Pulsatile tinnitus is a noise in the ears that is synchronous with the heartbeat.  The Merck Manual of Diagnosis and Therapy 778 (18th Ed. 2006).

- "Patient also is having difficulty driving at night, and it is like[ly] that her essentially blind eye is producing some cortical rivalry, giving her the difficulty driving."  (PRU000592.)

- "In addition working on the computer for extended periods is giving her pain and headaches, which is understandable considering her tumor is in the cavernous sinus and compressing the optic nerve.  She also is having trouble focusing."  (PRU000592.)

- Dr. Keltner also completed an Optical Coherence Tomography ("OCT") exam, and Dr. Keltner confirmed that Plaintiff had no damage to her right eye.  (PRU000593–94.)

71.     **Plaintiff's May 2011 Examination With Dr. Valicenti:**  Dr. Valicenti from radiation oncology examined Plaintiff again on May 2, 2011.  In his progress notes, he reported that "[t]he patient is doing relatively well. She still has occasional twitching of her left eye, as well as occasional discomfort that she notes is pretty much unchanged since prior to the time of radiation treatments."  (PRU000286.)

72.     He further noted that Plaintiff's KPS was 80%, her vital signs were stable, her neurologic exam was intact, and her gait was steady.  He concluded with, "[t]here are no specific recommendations at this time, other than see us back in six months for repeat evaluation."  (PRU000286.)

73.     **Plaintiff's May 2011 Otolaryngology Visit:**  Plaintiff was evaluated by an otolaryngology doctor, on May 3, 2011, for complaints of tinnitus and hearing loss.  (PRU000283.)  The notes indicate that Plaintiff reported problems with hearing for a year and random intermittent lightheadedness, but denied symptoms of spinning, tumbling or nausea.  (PRU00284 ("Plaintiff also complains of intermittent light-headedness that can occur randomly.  During these episodes, she would feel like lights are fading out and she has a hard time concentrating.  She denies feeling like the room is spinning, tumbling, or nausea during these episodes.  She is currently taking pain medications, which occasionally cause her to be fatigue [sic].").)

23

74.     Otolaryngology concluded that Plaintiff did have some mild conductive hearing loss in her left side and left tinnitus but that her word recognition abilities were excellent and she was not interested in a hearing device.  (PRU000285.)

**I.     Plaintiff Submits Additional Letters Supporting Her Disability**

75.     **Letter from Plaintiff's Assistant:** Plaintiff also submitted a letter of support from her assistant dated April 15, 2011:

- **"**I worked with Otilia so closely and watched her go through all the visual and physical issues that were associated with the tumor, she tried and did her best to continue working but I witnessed the strain it put on her because she was working less in the office, trying to work from home, and not able to service her clients as she once did before." (PRU000486.)

- "I recall many times she complained of headaches and difficulty reading emails, documents, and working on her laptop.  She would travel to real estate offices to meet with clients but she had to stop driving longer distances because of the pressure/headaches that occurred due to the tumor, strain on her right eye and difficulty driving in the evening. I recall in early August, as we were sitting at her desk, she was complaining to me that she was now seeing spots in her right eye and having a pressure related headache and that she was going to work from home the rest of the day." (PRU000486.)

76.     **Dr. Keltner's Letter:**  Plaintiff submitted a letter from Dr. Keltner, dated May 24, 2011:

- "[Plaintiff] has a known left sphenoid wing meningioma status post radiation therapy since May 2010, who we follow routinely for visual field defects and secondary left optic nerve atrophy.  At her most recent visit on 4/27/11, her vision was barely count fingers at 1 feet [sic] . . .  in the left eye - a decline since her prior visit on 6/29/10 when her vision was 20/150.  Her progression may be secondary to persistent tumor versus related to her prior radiation therapy." (PRU000590.)

- "Regardless, her visual prognosis remains poor and is unlikely to improve over the

24

long-term.  Despite a normal 20/20 right eye, Ms. Sullivan has great difficulty with

driving at night, likely secondary to cortical rivalry and her monocular visual

status.  Her symptoms include pressure and pain between both eyes, as well as in

the back of her head.  She has difficultly while using the computer and driving

particularly at night with oncoming lights.  She has found driving in the evening a

difficult challenge.  Given the visual difficulties that she is having, we hope that

consideration will be given as far as her disability specifically related to her

driving and her other visual demands."  (PRU000590.)

77.     **Dr. Larrow's Letter:**  Plaintiff also submitted a letter from Dr. Larrow from

Revolutions Natural Medical Solutions.  Dr. Larrow stated that she had first seen Plaintiff in July

2009 for an unrelated issue but that in January 2010, Plaintiff informed her that she had a tumor

behind her left eye.  The letter further read:  "The more Otilia does to strain her eyes the worse

her headaches and right eye become.  Eye strain seems to be directly related to increased

incidence [of] floaters and spots.  Otilia informed us that the tumor has not changed size or shape

and she is dealing with constant pressure in her head as a result of the tumor.  I am concerned that

the visual demands of her job, including long hours on a computer will exacerbate current

symptoms and create future Issues."  (PRU000474.)  Dr. Larrow concluded that Ms. Sullivan "is

currently dependant [sic] on her right eye to see, floaters and spots in her right eye are truly

debilitating."  (PRU000474.)

**J.     MLS Third-Party File Review By Neurosurgeon and Neuro-Ophthalmologist**

78.     Upon receipt of Plaintiff's additional records, Prudential requested that an external

neurosurgeon and neuro-ophthalmologist from a third-party vendor, MLS Group of Companies,

Inc. ("MLS") review Plaintiff's file.

79.     **Dr. Trobe's File Review:**  Dr. Jonathan Trobe M.D., a neuro-ophthalmologist,

conducted a file review of Plaintiff's medical records.  Dr. Trobe's report dated June 27, 2011,

states the following:

- "I discussed this case with Dr. Eugene Collins, a neurosurgeon . . . .  We agree that

  there is no medical justification for the patient's complaint of being unable to

sustain long periods of performing visual tasks.  Nor can her complaints of vertigo, tinnitus, or headache be attributed to the lesion or its treatment." (PRU000412.)

- "In the future, further tumor growth may occur, but it is unlikely.  Thus, additional neurologic deficits, including loss of vision in the right eye, are unlikely to occur. The patient's continued complaints of headache and vertigo cannot be attributed to the tumor or its treatment." (PRU000412.)

- "[T]here is no documentation from a visual standpoint supporting that Ms. Sullivan has any restrictions/limitations or impairment from the date of 10/15/10 going forward.  Although she has poor vision in one eye, she should be able to carry out all work duties and activities of daily living, including driving.  Visual impairment in one eye, even if total, does not cause any deficit in visual acuity if the unaffected eye has normal sight, which it has.  Loss of vision in one eye, even if total, causes only a minimal loss of the overall field of vision, one which does not interfere with daily living.  Loss of vision in one eye does reduce depth perception, but not to a degree that would interfere with any but the finest tasks, none of which are called for in this patient's life.  For example, individuals with sight in one eye only are permitted full passenger vehicle driving privileges in this country." (PRU000413.)

- "The claimant's vision loss in the left eye does not limit her ability to sit, stand, walk, reach, lift, carry, perform upper extremity activities, read, use a computer, operate a motor vehicle, concentrate, follow directions, or sustain such activities during the course of a work day." (PRU000413–414.)

- "The complaints of headache and vertigo cannot be attributed to the tumor or its treatment.  These are medically unverifiable symptoms that may well be of a non-organic nature." (PRU000413.)

- "Ms. Sullivan's self-reported symptoms and limitations are not supported by, consistent with, or proportionate to the documentation provided for review, including physical exams, diagnostic testing, and treatment records."

(PRU000414.)

- "Those restrictions and/or limitations given by the claimant's treating physicians are not necessary.  The assertions by the neuro-ophthalmologist that the claimant's visual complaints of difficulty seeing during night driving can be explained by 'cortical rivalry' or poor vision in one eye are not supported by medical evidence. In point of fact, full driving license privileges are not denied to individuals with comparable visual deficits.  The assertion by the radiation oncologist that the claimant should be granted 'less stressful work and time in front of a computer screen in an effort to diminish headaches and progressing vision deterioration' is medically indefensible."  (PRU000414.)

80.    **Dr. Collins's File Review:**  Dr. Eugene Collins M.D., a neurosurgeon, also conducted a file review of Plaintiff's medical records as part of the multidisciplinary panel review with Dr. Trobe.  Dr. Collins's report states the following:

- "It was discussed that the claimant's majority problems were visual, reportedly keeping her from working, stating that she has multiple visual symptoms, is blind in the left eye after radiation therapy and has difficulty working on a computer for any length of time because of the visual problems, as outlined in the body of the report."  (PRU000423.)

- "We discussed that Dr. Keltner, who is a Professor of Neurology and Ophthalmology at the University of California Davis Eye Center felt that there was cortical rivalry causing her to have problems with her monocular visual status causing her to be unable to work.  Dr. Trobe did not feel this theory was correct. He felt that the claimant was not precluded from working due to ophthalmological issues.  This was the area of her major complaints."  (PRU000423.)

- "This reviewer noted on review of the records, there was no major neurosurgical issue such as weakness, sensory deficit, gait problems, balance problems, etc. that would preclude the claimant from working.  The claimant, herself in the description of her inability to work, states most of such is on a visual basis."

(PRU000423.)

- "Dr. Trobe has the expertise to make a decision concerning claimant's visual status and her ability with her monocular vision to work. . . . In essence, he did not feel the claimant was impaired from a neuroophthalmology point and this reviewer did not conclude she was impaired particularly from a neurosurgical aspect per se." (PRU000423.)

- "Based on the records, reviewed, per a neurosurgical review, Ms. Sullivan does not have any medically necessary restrictions and/or limitations from one condition or a combination of conditions from 10/16/2010 forward." (PRU000424.)

- "On review of the chart there is no restriction that the claimant cannot sit eight hours a day per se or walk or stand during an eight-hour day.  Each activity should be done 45-60 minutes at a time with the ability to change positions for 3-5 minutes in general as a prophylactic measure. . . . There is no restriction in fine motor movements, hand activities, reaching overhead, typing, computer work from a neurosurgical basis.  Concerning potential visual problems, this will be addressed by Dr. Trobe."  (PRU000425.)

- "From a neurosurgical standpoint there is no restriction on ability to sit, stand, walk, reach, lift, carry, perform upper extremity activities, read, use a computer, operate a motor vehicle, concentrate, follow directions or to sustain such activities during the course of a workday from this reviewer's perspective. Concerning potential visual problems, this will be addressed by Dr. Trobe."  (PRU000425.)

- "Her symptoms of dizziness and lightheadedness appear to be related to fatigue, not a major neurological deficit according to otolaryngology."  (PRU000426.)

- "Dr. Keltner, neuroophthalmologist, states that the claimant cannot work due to ophthalmological issues including cortical rivalry.  Dr. Trobe will specifically address this in his review."  (PRU000426.)

81.   Both Dr. Trobe and Dr. Collins certified in their reports that they had no conflict of

interest, nor any financial incentive for a particular determination.  (PRU000415, 427–28.)

**K.**     **Prudential Denies Plaintiff's First Appeal**

82.     By letter dated July 8, 2011, Prudential upheld its denial of Plaintiff's long-term disability benefits.  (PRU001277–84; *see* PRU001278–79 ("Your claim for Long Term Disability benefits was disallowed because it was determined the available medical records did not support restrictions or limitations in your functioning which would prevent you from performing your regular occupation throughout or beyond the policy elimination period.").)

83.     **SSA Decision:** In the appeal denial letter, Prudential addressed the SSA decision as follows: "the Social Security Administration (SSA) determined you may be unable to perform your previous occupation in accordance with their review criteria.  Please note that they must make their determination on the information available to them and their rules and guidelines, and we must render our decisions based on the information in the LTD file and the provisions of the LTD policy.  As such, the approval of one type of benefit does not mean that another type of disability benefit will be approved.  Nor does the denial of one type of benefit mean that another type of disability benefit will be denied."  (PRU001283.)

84.     **Medical Information:**  In the appeal denial letter, Prudential also concluded that Plaintiff's vision problems did not affect her ability to perform her job.  (PRU001283 ("The medical documentation contained in your file supports that, with normal right eye vision, you continue to retain the visual acuity to perform your work tasks.").)

85.     "The information contained in your file also indicates you have reported headaches, dizziness and vertigo.  However, a review of the medical records contained in your file has determined that these symptoms would not be attributed to your tumor or treatment."  (PRU001283.)

86.     "Additionally ear, nose and throat examinations identified no observable middle ear vascular anomaly to explain the symptoms of dizziness.  There was no abnormality with your gait, balance or fine motor movements have been identified on medical evaluation [sic].  The available information does not support a functional impairment preventing occupational functioning from these symptoms."  (PRU001283.)

87.     "Based on a review of all information currently contained in your file we have determined there are not medically supported limitations in your functioning which would prevent you from performing the material and substantial duties of your regular occupation as it is normally performed.  In the absence of medically supported restrictions or limitations in your functioning, it has been determined you do not satisfy the policy definition of disability throughout or beyond the policy elimination period."  (PRU001283.)

**L.      New Jersey Department of Insurance**

88.     In late July 2011, the New Jersey Department of Insurance contacted Prudential regarding the denial of Plaintiff's disability claim.  Among other things, Prudential and the Department of Insurance discussed whether Plaintiff would be subject to an independent medical examination ("IME").  Prudential informed the Department of Insurance that "there is not a specific criteria which would cause us to perform or not perform an IME, rather such decisions are made on a claim by claim basis and IMEs are performed in circumstances where they were deemed appropriate as each claim is unique."  (PRU000432.)

89.     Additionally, the Department of Insurance disagreed with Prudential's finding with respect to Plaintiff's driving.  (PRU000431–32, 1246.)  Prudential's notes of the conversation read:  "Mr. Stanley [from the Department of Insurance] indicated he felt there were issues not addressed on appeal, stating [Prudential] had equated the claimant's ability to drive her children to school with her ability to drive during the day and evening hours for her work.  I respectfully disagreed and indicated that we had addressed the requirements of her occupation during the course of the appeal review and did acknowledge she would be required to drive for her occupation.  I advised we determined she would be capable [of] performing such a duty.  Mr. Stanley disagreed with this finding."  (PRU000432.)

**M.      Plaintiff Has Brain Surgery in August 2011**

90.     On July 18, 2011, Plaintiff was seen by Dr. Gary Steinberg M.D., Ph.D., Professor and Chair of the Department of Neurosurgery at Stanford Hospital.  (PRU000136.)

91.     Dr. Steinberg's notes disclose:

- "[Plaintiff] has been followed [sic] but recently experienced a bruit[16] at night.  As well as numbness in her left hand and occasional feelings of generalized weakness in the left arm.  She also has had worsening vision in the left eye and has seen a local neuroophthalmologist.  She has been on disability since her diagnosis from her job as a mortgage loan officer.  Because of her recent transient symptoms, her local MD suggested a PET of the brain, which hasn't taken place yet." (PRU000136.)

- "[Plaintiff was p]ositive for . . . fatigue, changes in vision on the left, . . . headache, weakness and numbness in the left arm, changes in memory, dizziness, neck and back pain, and nervousness."  (PRU000137.)

- "[L]eft optic nerve atrophy noted. . . . There is severe narrowing of the left carotid artery[17] on MRA.[18]"  (PRU000138.)

92.     Dr. Steinberg opined that the tumor appeared to be active and was blocking the left carotid artery.  Dr. Steinberg advised surgery to resect the tumor and bypass the obstructed artery in Plaintiff's brain.  (PRU000138; PRU000175 ("Based on these findings, I feel her tumor is active and leading to occlusion of her carotid artery.  I have recommended surgical resection and cerebral bypass to prevent further neurological decline.").)

93.     The attempt to resolve Plaintiff's blood flow with balloon occlusion of the carotid artery was unsuccessful.  (PRU000012.)  Therefore, on or about August 2, 2011, Dr. Steinberg

---

[16] A bruit is a "sound heard over an artery or vascular channel, reflecting turbulence of flow. . . ." Bruit definition – Medical Dictionary, Definitions of Popular Terms Defined on MedTerms, http://www.medterms.com/script/main/art.asp?articlekey=38528 (last visited July 7, 2014).

[17] The carotid arteries pass up the neck and supply blood to the head.  Merriam-Webster's Collegiate Dictionary 174 (10th ed. 2001).

[18] MRA stands for "magnetic resonance angiogram" and "is a general term that refers to various imaging techniques that are used to visualize the blood vessels by using magnetic resonance (MR) signal changes that are affected by changes in the flow of blood caused by changes in the shape of the blood vessels."  MRA definition – Medical Dictionary, Definitions of Popular Terms Defined on MedTerms, http://www.medterms.com/script/main/art.asp?articlekey=12199 (last visited July 7, 2014).  MRI stands for "magnetic resonance imaging" which is "a noninvasive diagnostic technique that produces computerized images of internal body tissues and is based on nuclear magnetic resonance of atoms within the body induced by the application of radio waves." Merriam-Webster's Collegiate Dictionary 698 (10th ed. 2001).

1    performed brain surgery i.e., a craniotomy, to resect the tumor and to redirect proper blood flow

2    to Plaintiff's brain.  (PRU000012, 37–44; *see also* PRU000252 ("[C]laimant underwent surgery

3    for resection of her tumor and an STA-MCA bypass.  Progress notes reveal that an approximately

4    2.5 cm diameter tumor was found on the left side.  The tumor was encroaching on the optic nerve

5    and enveloped the third nerve as it entered the cavernous sinus.")  The entire operating room time

6    was approximately eleven hours.  (PRU000027.)

7         94.    While Plaintiff was at the hospital she underwent memory testing.  The therapist

8    noted that Plaintiff had "normal" immediate and long-term memory but also that she had

9    "moderately impaired" short term memory and "mildly impaired" working memory.

10   (PRU000047 ("present[ed] with mild working and moderate [short term] memory deficits.

11   [Patient] aware of deficits though lacks skills to compensate for same at this time.").)

12   **N.    Plaintiff's Medical Visits After Surgery**

13        95.    On September 19, 2011, Plaintiff consulted with Dr. Steinberg for a follow-up to

14   the surgery.  Dr. Steinberg noted:

15        • "Since her surgery, [Plaintiff] has done well.  She has mild to moderate ongoing

16           headaches that occur mostly after reading or other eye strain.  She takes Norco for

17           these which is effective.  These headaches are improving compared with pre-

18           operatively.  She notes numbness of the upper left face.  She has subjective

19           diplopia[19] which has been improving since the surgery.  She continues to have

20           minimal vision in the left eye."  (PRU000162.)

21        • "She will continue to have improvement over the next few months.  Her

22           headaches and memory problems that predate the surgery continue to be an issue

23           and hopefully these will have some further improvement."  (PRU000163.)

24        96.    By letter dated October 14, 2011, Dr. Steinberg noted that after the surgery,

25   "[Plaintiff] continues to have headaches requiring narcotic pain medications as well as numbness

26   in the left face.  She has double vision as well as continued decreased vision in the left eye which

27

28   [19] Diplopia is double vision.  Mark H. Beers, MD, The Merck Manual of Diagnosis and Therapy 874 (18th ed. 2006).

1   she states affects her driving at night and using a computer.  She will continue to have

2   improvement over the next few months.  She has been instructed to follow up with her local

3   neuro-ophthalmologist for visual exams."  (PRU000012.)

4        97.   Plaintiff also consulted with Dr. Keltner again on October 5, 2011.  He noted:

5   •  "Patient has left optic nerve atrophy secondary to the tumor, as well as new left

6      cranial nerve III palsy[20] with subsequent diplopia possibly as a result of the direct

7      effect of the tumor or indirectly due to chronically decreased blood flow[.]"

8      (PRU000016.)

9   •  "Patient says since the surgery she is having constant headaches.  She also says

10     since the surgery she is having double vision.  Double is worse in down gaze and

11     watching TV.  If she drops her chin she can get rid of double vision.  When she

12     drives she drops her chin or carries a patch in the car in case she needs it.  She uses

13     a patch when she needs it for the double.  She notes that double is worse with

14     fatigue.  She also notes that she is having more nausea with reading and double in

15     down gaze in the reading position."  (PRU000016.)

16       98.   Plaintiff also consulted with Dr. Gooderham M.D., a clinical instructor at

17  Stanford's Department of Neurosurgery.  By letter dated October 5, 2011, Dr. Gooderham wrote:

18  "I spoke with Otilia Sullivan today, 10/5/2011 in regards to her headaches.  She states that these

19  persist and she wanted to clarify that while they have improved somewhat since her discharge

20  from the hospital, they remain more bothersome than the headaches she was experiencing before

21  surgery.  She remains on hydrocodone for these headaches.  She feels they are brought on by the

22  diplopia and visual strain.  She has had no changes since she was last seen in clinic.  I reassured

23  her that the imaging done at her last visit showed no surgical cause for the headaches and that she

24  should see improvement in these with time. . . ."  (PRU000166.)

25  **O.**   **Plaintiff's Second Appeal**

26       99.   By letter dated December 14, 2011, and through counsel, Plaintiff submitted a

27

28  [20] Third cranial nerve palsy impairs ocular motility and sometimes pupillary function.  The Merck Manual of Diagnosis and Therapy 1872 (18th Ed. 2006).

1    second appeal of Prudential's denial of her long-term disability benefits claim.

2         100.   **Medical Information:**   In the second appeal letter, Plaintiff stated that the crux of

3    the dispute was the severity of her symptoms not the existence of her condition or her treatment.

4    (PRU000193 ("Prudential is not disputing the presence of the tumor or the necessity of the

5    treatment Ms. Sullivan has undergone.  Prudential is not disputing that the radiation treatment has

6    left her legally blind in her left eye and with hearing loss.  Instead, Prudential is disputing the

7    severity of Ms. Sullivan's symptoms due to these undisputed conditions.").)

8         101.   Plaintiff argued that Prudential sought improper objective confirmation of

9    subjective symptoms.  (PRU000194 ("As Prudential knows, there are no tests to confirm

10   headaches, pain, fatigue and/or dizziness.  Therefore, Prudential is seeking medical information

11   Ms. Sullivan will never be able to provide.  Ms. Sullivan has already provided plenty of

12   consistent medical evidence documenting her persistent complaints[.]").)

13        102.   Plaintiff questioned Prudential's reliance on doctors who had never examined

14   Plaintiff or were not specialists.  (PRU000197 ("Prudential is relying upon two medical

15   reviewers, neither of which have actually examined Ms. Sullivan [nor] examined the films to

16   determine the location, size and impact the tumor has had on her optic nerve.").)

17        103.   **Vocational Assessment:** Plaintiff also disagreed with Prudential's vocational

18   assessment.  (PRU000197 ("while Ms. Sullivan cannot perform the *physical* requirements of her

19   occupation- driving, reviewing documents- the main thrust of Prudential's vocational analysis

20   should have been the non-exertional requirement of a Senior Loan Officer. . . . Ms. Sullivan's

21   pre-disability occupation requires the highest level of executive functioning and attention to

22   detail.").)

23        104.   Plaintiff submitted a contrary vocational opinion by Paul Broadus, M.A.  Mr.

24   Broadus opined that Plaintiff was required as part of her job duties to perform significant amounts

25   of reading and computer work.  (PRU000210 ("In this occupation Ms. Sullivan has to review

26   approximately 100 pages of documentation for each client, consisting of tax returns, bank

27   statements, and other financial figures. Self-employed clients and those with business returns

28   have far more paperwork. She also had to spend 2 to 3 hours per day on the computer reviewing

loan information, compliance regulations, and mortgage guidelines and policies. During loan closings she is required to spend an additional 10-30 minutes per application, per day on the computer.").)  Mr. Broadus concluded that "due to Ms. Sullivan's disability she is unable to perform all the material duties of her regular occupation as a Loan Officer."[21]  (PRU000212.)

105.   **Ongoing Treatment:** Plaintiff also provided a summary chart with Plaintiff's updated medical information.  (PRU000199 ("Ms. Sullivan's condition has worsened post-denial and she [] ultimately underwent surgery in August of 2011 to relieve the pressure on her carotid artery.  Despite undergoing this surgery, her symptoms have not resolved.").)

106.   **Videotaped Statements from Doctors:** Plaintiff also provided three videotaped statements from three doctors, Dr. James Boggan M.D. (neurological surgeon), Dr. Arthur Swislocki M.D. (endocrinologist), and Dr. Ruben Fragoso M.D., Ph.D. (radiation oncologist), stating their belief that Plaintiff was disabled.  (PRU000203–04.)

**P.      MLS's Dr. Trobe and Dr. Collins Review Plaintiff's Additional Medical Records**

107.   After reviewing Plaintiff's additional records, on January 24, 2012, Dr. Trobe issued an addendum to his original report.  He concluded: "[t]he additional information does not alter my prior assessment. Acknowledging that the claimant has undergone two brain procedures since my original assessment, I find no compelling reason from an ophthalmic viewpoint to disable her from the tasks of her current job."  (PRU000228.)

108.   Dr. Collins also issued an addendum to his report.  However, in his report dated January 30, 2012, he altered his prior assessment "to a degree."  (PRU000238.)

- "Based on the angiogram/MRA and MRI, it is documented that there was decreased flow in the left carotid artery due to the narrowing by the tumor. The claimant is right handed, and the left carotid would supply the dominant hemisphere of the brain."  (PRU000238.)

- "The claimant complained of trouble with concentrating, memory problems, etc.

---

[21] Mr. Broadus also concluded that "solely due to her disability, she is unable to perform the material duties of any gainful occupation for which she is, or may reasonably become, qualified based on education, training, or experience, commensurate with her station in life." (PRU000212.)

1    This is documented in the hospitalization notes of August 2011 at Stanford

2    University with the claimant having some difficulty with memory issues. It is

3    possible that the low flow to the left side of the brain could affect some cognitive

4    abilities." (PRU000238.)

5    •   "[T]here is documented evidence that the claimant did have decreased cerebral

6    blood flow on the left leading to major surgery to enhance left-sided cerebral

7    circulation as well as the removal of the tumor which was done in August 2011.

8    Based on such, it would not be unreasonable that the claimant could not work from

9    the time of the issuance of this reviewer's initial report of 7/1/11 through the

10   surgery up until the follow up in March 2012 by Dr. Steinberg." (PRU000238.)

11   •   "Concerning her fatigue and stress, this is difficult to quantify per se.  Her

12   headaches remain an issue, but it was felt by Dr. Steinberg that they have a chance

13   of improving in time as would her cranial nerve functions concerning vision.

14   Hence, until March 2012 follow up with Dr. Steinberg, the claimant from a

15   neurosurgical standpoint would be unable to work until further evaluation takes

16   place." (PRU000238–39.)

17   •   "Concerning the visual problems per se, this seems to be the major issue involving

18   computer work as noted by the three interviews.  In March 2012 such should be

19   formally assessed.  Dr. Trobe will comment further on such." (PRU000239.)

20   **Q.    Dr. Neuren, an Internal Neurologist for Prudential, Conducts a File Review**

21       109.    After receiving Dr. Trobe and Dr. Collins's addenda, Prudential requested that Dr.

22   Alan Neuren, M.D., an internal neurologist for Prudential, review the additional information

23   submitted by Plaintiff in connection with her appeal.  (PRU001107–14; PRU001261 ("In order to

24   give further consideration to your client's claim, including her approval for Social Security

25   Disability benefits, the medical data contained in your client's file was also reviewed by an

26   internal neurologist.").)

27       110.    In his analysis dated February 23, 2012, Dr. Neuren noted the following:

28   •   "Loss of vision in one eye should not otherwise impair an [sic] individual except

36

for those activities requiring a high degree of depth perception.  Individuals with monocular vision (i.e., vision in only one eye) should be fully capable of otherwise functioning.  Binocular vision is not required for reading or looking at a computer.  The screen and pages are flat.  As a consequence there is no call for depth perception.  As depth perception beyond eight feet uses visual cues beyond binocular vision, individual with vision in one eye can drive.  Overall loss of total visual field is minimal.  The contention that reading, looking at a computer, or other reported activities would cause problems with headaches and other claimed symptoms such as nausea or dizziness is not supported, nor is it credible."  (PRU001105.)

- "Other than activities requiring depth perception there are nomedically [sic] necessary restrictions or limitations as of 10/16/10.  There would be support for impairment for a six week period following the surgical intervention in August of 2011 to allow for recovery. Insured reportedly developed double vision around the time of the surgery.  This would suggest a higher level of visual acuity in the left eye than reported as it takes intact vision in two eyes to have double vision.  Regardless, this can effectively be dealt with by covering the visually impaired eye."  (PRU001105.)

- "There are no findings that would restrict or limit the insured's ability to sit, stand, walk, reach, lift, carry, perform activities with her upper extremities, use a computer or hand held device, read, operate a motor vehicle, or to sustain such activities."  (PRU001106.)

- "Records from Dr. Keltner fail to document floaters. The complaint of tinnitus cannot be validated, but would not result in impairment. Complaints of headaches have been variable.  They were not noted to be significant until after her claim was denied.  There was subsequent worsening after the surgery in August, but with noted improvement.  Headaches have not required significant intervention.  Insured is reporting doublevision.  This has been attributed to damage to one or

two of the nerves that regulate eye movement. With severe visual loss, it is unclear how this would result in double vision, but can be effectively managed by covering the impaired eye. As there is profound visual loss in the left eye, vision in this eye would be blurred, but should be suppressed with normal vision in the right eye.  The loss of vision or impaired vision in the left eye should not impact working on a computer.  Not working should havehad [sic] no impact on her symptoms." (PRU001106.)

- "Reported symptoms and limitations are not supported by the findings." (PRU001106.)

- "Records do not support significant adverse effects from medications.  Until the recent surgery, insured was primarily taking Vitamins only."  (PRU001107.)

- "Restrictions and limitations are not medically necessary. Claimant reports symptoms were aggravated by the stress of her job.  This would be an occupational problem.  Visual loss in one eye should not have precluded her from functioning in the workplace." (PRU001107.)

- "The visual deficit in the left eye is likely permanent and may worsenover [sic] time.  The double vision should improve as the involved cranial nerves recover." (PRU001107.)

**R.**    **Social Security Administration Grants Plaintiff Disability Benefits**

111.    By letter dated February 22, 2012, the Social Security Administration reversed its previous decision and approved Plaintiff's disability claim.  (PRU000248 ("After careful review of the entire record, the undersigned finds that the claimant has been disabled from October 15, 2010, through the date of this decision.").)  The administrative law judge ("ALJ") cited the SSA's five-step sequential evaluation process for determining whether an individual is disabled: (1) determine whether claimant is engaged in substantial gainful activity; if so, then she is not disabled; (2) determine whether claimant has a severe impairment; if not, then she is not disabled; (3) determine whether the severity is equal to the criteria in 20 C.F.R. Part 404, Subpart P, Appendix 1; if so, then she is disabled; (4) determine whether the claimant has the residual

functional capacity to perform the requirements of past relevant work; if so, then the claimant is not disabled; and (5) determine whether claimant is able to do any other work considering her residual functional capacity, age, education, and work experience; if so, then she is not disabled. The ALJ marshalled through the steps and noted the following:

- "The claimant has the following severe impairments: blind in the left eye, hearing loss in the left ear, double vision in the right eye, migraine headaches, memory loss and degenerative disc disease of the cervical and thoracic spine, status post brain tumor." (PRU000250.)

- "The objective medical findings and the subjective evidence supports a finding that the claimant's physical impairments and accompanying symptoms from these impairments have severely impaired her basic work activities and activities of daily living." (PRU000250.)

- "Although the claimant has 'severe' impairments, objective findings and functional limitations do not meet the criteria of any listed impairments described in Appendix 1 of the [Code of Federal] Regulations . . . .  No treating or examining physician has mentioned findings equivalent in severity to the criteria of any listed impairments, nor does the evidence show medical findings that are the same or equivalent to those of any listed impairment of the Listing of Impairments. Additionally, it is noted that the claimant does not meet the statutory blindness requirements as stated in the Listing of Impairments." (PRU000250.)

- "The claimant has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 404.1567(a) except that the claimant can lift and carry 10 pounds.  The claimant can stand, walk, or sit for approximately 6 hours.  The claimant['s] near acuity and field of vision is limited to occasional, due to headaches and limited left-sided peripheral vision.  The claimant has limited left ear hearing.  The claimant should avoid concentrated exposure to hazards, machinery, and heights." (PRU000250.)

- "The claimant reported that her headaches have progressively worsened. The

39

claimant reported that she suffers from headaches daily.  The claimant reported that her headache pain symptoms are on the left and back of her head.  She reported that her headache pain and reduced vision affects her ability to read and see." (PRU000251.)

- "After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, and that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are generally credible." (PRU000253.)

- "The demands of the claimant's past relevant work exceed the residual functional capacity.  The claimant has past relevant work as a mortgage loan officer . . . . In comparing the claimant's residual functional capacity with the physical demands of the above work, the undersigned finds the claimant was able to perform the above work as generally and actually performed.  However, the above job requires increased functional ability.  The claimant's above stated residual functional capacity provides that she can perform less than sedentary activity.  In reaching this conclusion, the undersigned relied on the medical evidence record.  As such, the claimant's current residual functional capacity precludes the performance of all past relevant work." (PRU000253.)

- "Based on the application for a period of disability and disability insurance benefits filed on January 20, 2011, the claimant has been disabled under section 216(i) and 223(d) of the Social Security Act since October 15, 2010." (PRU000254.)[22]

## S.   Prudential's Internal Neurologist Dr. Neuren Reviews Plaintiff's Favorable SSA Decision

112.   In light of Plaintiff's favorable SSA decision, Prudential requested that Dr. Neuren

---

[22]  The SSA concluded that there were no jobs that exist in significant numbers in the national economy that the Plaintiff could perform.  (PRU000254.)

complete an additional review.  On March 15, 2012, Dr. Neuren concluded that the "[n]ew information does not alter the prior opinion." (PRU001099.)  With respect to the SSA decision itself, Dr. Neuren opined: "although the insured reported severe impairments, objective findings did not meet the criteria of listed impairments. [The Administrative Law Judge] noted no treating or examining physician mentioned findings equivalent in severity. It was noted insured did not meet statutory requirements for blindness. Despite the inconsistencies, the judge relied heavily on the assessment of a Dr. Huddleston who evaluated the insured after her claim was denied.  He also noted the insured's inability to drive at night was a factor.  There was also reference to the mild MRI findings on studies done after the claim was denied." (PRU001098–99.)

## T.    Prudential Denies Plaintiff's Second Appeal

113.    By letter dated April 3, 2012, Prudential denied Plaintiff's second appeal. (PRU001253.)  Despite Plaintiff's additional medical records, Prudential determined that Plaintiff had no medically supported limitations as of October 16, 2010.  (PRU001263.)

114.    As for the fully favorable SSA determination, Prudential relied on Dr. Neuren's opinion that: "although Ms. Sullivan reported severe impairments, objective findings did not meet the criteria of listed impairments for the SSA.  The [SSA] letter further notes no treating or examining physician mentioned findings equivalent to the severity of symptoms reported by [Plaintiff.] This is consistent with the findings of the external reviewers and internal reviewing neurologist during the course of Ms. Sullivan's appeals.  The decision by the SSA also refers to and relies on examinations and diagnostic studies performed after the initial disallowal of Ms. Sullivan's claim." (PRU001262.)

115.    Prudential also noted: "[w]e understand Ms. Sullivan has a medical condition which required treatment that resulted in visual loss in her left eye and that Ms. Sullivan may continue to undergo additional monitoring and treatment.  In order to be eligible for LTD benefits one must be continually disabled throughout and beyond the policy elimination period as defined in the Policy.  The medical documentation contained in your client's file supports that, with normal right eye vision, she retained the visual acuity at the time she initially ceased work required to perform her work tasks." (PRU001262–63.)

1   **II.      CONCLUSIONS OF LAW**

2          **A.      <u>Legal Standard</u>**

3          1.      Federal Rule of Civil Procedure 52(a)(1) provides that "[i]n an action tried on the

4   facts without a jury . . .  the court must find the facts specially and state its conclusions of law

5   separately.  The findings and conclusions may be stated on the record . . . or may appear in an

6   opinion or a memorandum of decision filed by the court.  Judgment must be entered under Rule

7   58."

8          2.      This Court has jurisdiction pursuant to the Employment Retirement Income

9   Security Act ("ERISA").  *Clorox Co. v. U.S. Dist. Court for N. Dist. of Cal.*, 779 F.2d 517, 521

10  (9th Cir. 1985) ("ERISA creates a federal cause of action, with concurrent state and federal

11  jurisdiction, over claims by an employee 'to recover benefits due to him under the terms of his

12  plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits

13  under the terms of the plan.'") (quoting 29 U.S.C. § 1132(a)(1)).

14         3.      "ERISA represents a careful balancing between ensuring fair and prompt

15  enforcement of rights under a plan and the encouragement of the creation of such plans."

16  *Conkright v. Frommert*, 559 U.S. 506, 516–17 (2010) (internal citations and quotation marks

17  omitted).  "Congress enacted ERISA to ensure that employees would receive the benefits they

18  had earned, but Congress did not require employers to establish benefit plans in the first place."

19  *Id.* (citing *Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996)).

20         4.      The parties agree that the long-term disability plan at issue in this case is an

21  "employee welfare benefit plan" subject to ERISA.  *See* 29 U.S.C. § 1002(1) (defining "employee

22  welfare benefit plan" and "welfare plan" to include "any plan, fund, or program . . . established or

23  maintained by an employer or by an employee organization, or by both, to the extent that such

24  plan, fund, or program was established or is maintained for the purpose of providing for its

25  participants or their beneficiaries, through the purchase of insurance or otherwise[] . . . benefits in

26  the event of sickness, accident, disability, death or unemployment").

27         5.      "[A] denial of benefits challenged under [ERISA] is to be reviewed under a de

28  novo standard unless the benefit plan gives the administrator . . . discretionary authority to

42

1   determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber*

2   *Co. v. Bruch*, 489 U.S. 101, 115 (1989). "[F]or a plan to alter the standard of review from the

3   default of de novo to the more lenient abuse of discretion, the plan must unambiguously provide

4   discretion to the administrator." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th

5   Cir. 2006) (en banc). The burden is on "the administrator . . . to show that the plan gives it

6   discretionary authority in order to get any judicial deference to its decision." *Kearney v. Std. Ins.*

7   *Co.*, 175 F.3d 1084, 1089 (9th Cir. 1999) (en banc), *cert. denied*, 528 U.S. 964 (1999).

8         6.     This Court, through the Honorable Judge Burrell, has already found that the

9   appropriate standard of review governing the challenge to Defendants' denial of Plaintiff's claim

10  for long-term disability benefits under ERISA is de novo. (Order, ECF No. 41.)[23]

11        7.     "When conducting a de novo review of the record, the court does not give

12  deference to the claim administrator's decision, but rather determines in the first instance if the

13  claimant has adequately established that he or she is disabled under the terms of the plan." *Muniz*

14  *v. Amec Const. Mgmt., Inc.*, 623 F.3d 1290, 1295–96 (9th Cir. 2010); *see also Kearney*, 175 F.3d

15  at 1095 (holding that under a de novo review, a district court evaluates "whether [the plaintiff] is

16  disabled within the terms of the policy"), *cert. denied*, 528 U.S. 964 (1999).[24]

17        8.     Furthermore, in resolving cross-motions for judgment, the district court can

18  evaluate the persuasiveness of conflicting testimony and decide which is more likely true. *Id.*

19        9.     This Court therefore does not examine whether Prudential's actions were

20  reasonable. *Compare Montour*, 588 F.3d at 629 (holding that abuse of discretion standard, the

21  plan administrator's decision can be upheld if it is 'grounded on any reasonable basis.'") (quoting

22  *Sznewajas v. U.S. Bancorp Am. & Restated Supp. Benefits Plan*, 572 F.3d. 727, 734–35 (9th Cir.

23  2009)); *see also Conkright*, 559 U.S. at 521 ("Applying a deferential standard of review . . .

24  means only that the plan administrator's interpretation of the plan 'will not be disturbed if

25      [23] For the reasons provided *infra* the Court upon review of the administrative record de novo,
26  finds that Plaintiff is disabled. The Court expresses no opinion as to whether it would have
    upheld Prudential's decision under an arbitrary and capricious standard of review.

27  [24] Prudential correctly states the standard of review in its briefing but lodged a proposed order
    with an incorrect standard of review. (ECF No. 26-1 at 22 ("[t]he standard of review is abuse of
28  discretion"; "Prudential did not abuse its discretion in denying Plaintiff's claim for benefits.").)

1    reasonable.'") (quoting *Firestone*, 489 U.S. at 111).  Rather, the Court will examine the facts in

2    the first instance to determine whether Plaintiff is disabled.

3          10.    In an ERISA action, the plaintiff carries the burden of showing, by a

4    preponderance of the evidence, that he or she was disabled under the terms of the Plan during the

5    claim period.  *Oster v. Standard Ins. Co.,* 759 F. Supp. 2d 1172, 1185 (N.D. Cal. Jan. 5, 2011).

6          **B.    <u>Analysis</u>**

7          11.    The sole issue in the instant motions is whether Plaintiff was disabled in her

8    regular occupation under the applicable Prudential long-term disability plan.  Under this "regular

9    occupation" definition of disability, the employee must be unable to perform the material and

10   substantial duties of his or her regular occupation due to sickness or injury.  (PRU001330.)

11   Furthermore, the employee must be continuously disabled during the 26-week elimination period.

12   Plaintiff's elimination period was from October 15, 2010, to April 15, 2011.[25]  (ECF No. 44 at

13   27:4-6 (arguing that Plaintiff must establish she was disabled as of October 15, 2010, and

14   throughout the elimination period).)  Thus, the Court must determine whether Plaintiff was unable

15   to perform material and substantial duties of her regular occupation due to her sickness or injury

16   from October 15, 2010, to April 15, 2011.  Defendants contend that Plaintiff was not disabled

17   continuously during the elimination period.  (*See* ECF No. 44 at 4:13–15 "Plaintiff cannot meet

18   her burden of establishing that she was disabled under the terms of the long term disability plan <u>at</u>

19   <u>the time Prudential closed her claim</u>[.]" (emphasis added).)  The Court, however, finds that the

20   overwhelming evidence supports the conclusion that Plaintiff was disabled from her regular

21   occupation during the elimination period.

22         12.    Plaintiff's medical evidence demonstrates that she could not work as a loan officer

23   given her limitations as detailed by her physician.  Specifically, it was noted that her limitations

24   prevented her from performing computer work and driving at night.  The parties agree that

---

25   [25] The Court notes there are conflicting references to Plaintiff's date of disability; some
26   documents state the date is October 15, 2010, and others state that the date is October 16, 2010.
     The Court adopts Defendants' position in their briefing that the applicable date is October 15,
27   2010.  (*See* ECF No. 44 at 27; ECF No. 51 at 1.)  Furthermore, the minor discrepancy in the date
     does not alter the Court's finding regarding Plaintiff's disability.  Should the parties wish to
28   clarify this issue they may do so in the proposed amended judgment required *infra*.

1    Plaintiff's job duties as a loan officer require extensive computer work, and driving to meet

2    clients after normal business hours.  Plaintiff's physicians, including Dr. Valicenti, Dr.

3    Huddleston, and Dr. Yi from UC Davis opined that due to Plaintiff's condition she could not stare

4    at a computer screen nor drive at night.  Dr. Keltner opined that Plaintiff could not work due to

5    her double-vision, likely caused by cortical rivalry.  The Social Security Administration

6    consistently opined that Plaintiff was disabled from working in her own occupation even though

7    it reconsidered whether she was disabled for any occupation.  Plaintiff has consistently

8    complained of symptoms of a varying nature including headaches, vision issues, tinnitus and

9    twitching to several doctors, including radiation oncologists, ophthalmologists, endocrinologists,

10   otolaryngologists, and neurologists.

11           13.     The Court finds that the Ninth Circuit case of *Silver v. Executive Car Leasing*

12   *Long-Term Disability Plan*, 466 F.3d 727 (9th Cir. 2006) is edifying.[26]  In *Silver*, the plaintiff

13   alleged he was disabled due to a deteriorating heart condition.  Plaintiff had a history of heart

14   issues but he continued to work as a sales manager at a car-leasing company, a position that the

15   parties agreed was stressful.  In December 2000, the plaintiff had chest pain necessitating an

16   angioplasty.  Upon his doctor's advice, plaintiff stopped working and filed a claim for long-term

17   disability with his employer's insurance company, the defendant.  Pursuant to the administrator's

18   policy, plaintiff had to be disabled continuously for 90 days following the initial date on which he

19   claimed disability.  In the 90 days that followed, plaintiff continued to experience complications

20   related to his cardiac condition but the medical notes were mixed.  For example, a pulmonary

21   specialist noted that there was only a "mild obstruction" of plaintiff's blood vessels, and doctors

22   indicated that there had been improvement in the area where the angioplasty had been performed.

23   *Id.* at 729–30.  On the other hand, other medical notes revealed decreased blood flow on the left

24   side of plaintiff's body, that plaintiff had symptoms consistent with bronchitis and emphysema,

25   and that he suffered from sleep apnea.  During this time the plaintiff reported being able to

26   exercise three or four times per week but also reported shortness of breath.  After the 90-day

27   

28   [26] None of the parties cited this instructive case.

1  period expired, the plaintiff had a third angioplasty procedure and required a visit to the

2  emergency room for his continuing heart problems. *Id.* at. 730.

3       14.    The administrator denied plaintiff's claim finding that he had not demonstrated he

4  was continuously disabled during the 90-day elimination period. *Id.* at 731.  Under a de novo

5  review, the district court upheld the administrator's decision but the Ninth Circuit reversed. *Id.* at

6  731, 736.  The court held that the district court focused "myopically" on favorable test results

7  indicating improvement and on plaintiff's exercise routines while ignoring contrary complaints by

8  plaintiff that he was having trouble walking and cleaning his house and also overlooking his

9  physician's recommendation to cease work. *Id.* at 734.  Moreover, because plaintiff returned to

10  the emergency room only weeks after the elimination period and required another angioplasty

11  procedure, the Ninth Circuit was convinced the district court clearly erred in ruling that plaintiff

12  was not disabled. *Id.* at 735.  In so holding, the Ninth Circuit repeatedly rejected the

13  administrator's argument that timing of the plaintiff's symptoms during the elimination period

14  must be acute. *Id.* at 735–36.  Rather, it adopted a comprehensive view of disability and

15  identified plaintiff's condition as a "progressive and degenerative" disease. *Id.* at 734.

16       15.    Similarly, in the instant case Plaintiff claimed disability due to a benign brain

17  tumor and the effects of radiation to treat that tumor.  Despite Plaintiff's diagnosis, she continued

18  to work as a senior loan officer, a position that Defendant does not dispute is stressful.  In

19  September 2010, after a follow up visit to UC Davis radiation oncology, several doctors opined

20  that she was unable to continue to work.  Pursuant to Prudential's policy, plaintiff must be

21  continuously disabled during a 26-week elimination period from October 2010 to April 2011.

22  During that time period, Plaintiff continued to experience symptoms of intermittent headaches,

23  visions issues, tinnitus, and twitching but the medical records disclosed mixed results about her

24  improvement.  For example, several physicians noted that Plaintiff had KPS scores of 80 to 100%

25  and that her symptoms appeared to have resolved; however, other medical notes disclosed that her

26  vision issues were becoming worse.  After the elimination period expired, Plaintiff's doctors

27  discovered that the tumor was blocking an artery that supplies blood to the brain.  Doctors

28  performed an 11-hour craniotomy to restore bloodflow and debulk the tumor.  Since then,

Plaintiff's symptoms have become progressively worse.  As set forth below, this Court follows the Ninth Circuit guidance in *Silver*.

16.  **KPS Scores:**  Defendants rely heavily on the physicians who evaluated Plaintiff as having 80 to 100 % KPS.  (*See* ECF No. 44 at 27:25–26 ("In a medical note dated June 28, 2010, Dr. Valicenti noted that Plaintiff's KPS was 90 to 100%); *id.* at 27:27 ("on September 29, 2010, two weeks before Plaintiff left work, Plaintiff returned for a follow up with Dr. Huddleston after radiation therapy, and the medical record noted Plaintiff's KPS was 80-90%.").)  The parties do not provide evidence as to whether the physicians used the KPS rating as a gauge for Plaintiff's general physical ability or her amenability to further types of aggressive tumor treatment.   Nor do the parties provide evidence that KPS is used for daily living as opposed to determining disability in sophisticated employment as a loan officer.  In the absence of evidence either way, either inference would be plausible.  However, the Court notes that several doctors who examined Plaintiff and provided a KPS score of 80 to 90% did so under a physical examination section in their notes, indicating that KPS was for evaluating her physical demeanor instead of an evaluation of whether she was disabled for the purposes of her occupation.  Furthermore, Defendants leave out the fact that the KPS score for Plaintiff became progressively worse, registering as an 80-90% in September 2010 but then lowering to an 80% in January and April.  Overall, the Court finds this evidence is non-dispositive.

17.  **Visual Acuity:**  Defendants conclude that because Plaintiff could still see within 20 inches or less she should be able to use the computer and perform the duties of a loan officer.  (ECF No. 44 at 27 (noting that Plaintiff had 20/20 vision in her right eye and clarity of vision at 20 inches or less); *id.* (loss of vision in one eye, even if total, causes only a minimal loss of the overall field of vision).)  Defendants go to great length to emphasize that monocular individuals should not suffer from double vision, particularly if their affected eye is covered, and that monocular individuals are also given full driving privileges.  Plaintiff admits in her motion for summary judgment that "if her only problem was impaired vision in her right eye she would still be at work."  (ECF No. 46 at 20:20–21.)  Plaintiff argues, however, that she had additional problems including headaches, pain, pressure, tinnitus, dizziness, vertigo, twitches, and fatigue.

47

18.     The Court agrees with Plaintiff.  Prudential's attempt to limit Plaintiff's disability to something that is merely visual pervades their decisions throughout this case.  For example, the MLS reviewers Dr. Trobe and Dr. Collins are careful to delineate and distinguish their fields of specialty between ophthalmology and neuroscience.  Dr. Trobe in both his initial report and addendum limited his opinion to ophthalmology only.  Like the Ninth Circuit in *Silver*, the Court finds that this divide and conquer technique provides an incomplete picture of Plaintiff's condition in these circumstances.  *Silver*, 466 F.3d at 734 ("[T]he district court's factual findings and legal conclusions do not reflect a complete examination of the record and disregard significant evidence recommending the seriousness of Silver's impairment.").  Plaintiff is not arguing that she is unable to work because she is monocular; she is unable to work because she has a tumor which necessitated radiation resulting in a host of ongoing symptoms preventing her from doing her job.  Those symptoms include, but are not limited to, deteriorating vision in her left eye.  It was not the mere loss of vision that made Plaintiff unable to work, it was the way in which the vision was lost and the accompanying symptoms that still exist today.  (ECF No. 53-1 at 4:17–21 ("Ms. Sullivan is not claiming to be disabled solely from twitching, or her hearing loss, or her vision loss.  She is also not claiming that her dizziness and fatigue–which Prudential's brief ignores–would alone disable[] her.  However these problems all add to Ms. Sullivan [sic] lack of capacity, and should all be accounted for in determining whether Ms. Sullivan can return to work.").)  In isolation, Plaintiff's diagnosis, her visual issues, her headaches, or her fatigue may not have in themselves constituted a finding of disability.  However, in this case the Court finds the sum is greater than its isolated parts, i.e., Plaintiff's disability is greater than her symptoms viewed in isolation.[27]

19.     **Stress:** Defendants rely heavily on Plaintiff's statements and doctor statements that Plaintiff's symptoms were brought about from job stress.  Defendants argue that if the source

---

[27] While every ERISA case evaluating a patient's alleged disability and the administrator's decision is unique, the Court notes at least one other instance where a plaintiff with a benign tumor complained of difficulty driving at night and an inability to read or review a computer without pain.  *See Tebo v. Sedgwick Claims Mgmt. Servs., Inc.*, CIV.A.09-40068-FDS, 2010 WL 2036961 (D. Mass. May 20, 2010).  Notably, the district court found the plaintiff disabled.

1   of the symptoms was stress, then this would be an occupational problem and thus her symptoms

2   could not be attributed to her disability.  However, it is undisputed that stress can exacerbate

3   physical symptoms and stress can be an inherent and essential part of certain occupations.  *See,*

4   *e.g., Silver*, 466 F.3d at 729 (noting that the parties agreed plaintiff's sales manager position was

5   stressful); *Lundquist v. Continental Casualty Co.*, 394 F. Supp. 2d 1230, 1251–1252 (C.D. Cal.

6   Sept. 30, 2005) (noting that plaintiff's medical condition was aggravated by the stress of her

7   work).

8        20.    Furthermore, Defendants' argument that Plaintiff's stress was a mere occupational

9   problem is unpersuasive.  Plaintiff had worked in the position of a loan officer for 16 years for

10   PHH and prior to that she worked for several years at a different company.  Based on Plaintiff's

11   lengthy experience in the field in which she worked, the Court is not persuaded that her reaction

12   to occupational stress would result in the symptoms that she complains of herein.  Rather,

13   Plaintiff's symptoms are consistent with medical records indicating that her symptoms subsided

14   when she was not required to work on a computer or drive at night.

15        21.    Furthermore, courts have found that simply being able to perform sedentary work

16   does not necessarily enable one to work in a particular job.  *See, e.g.*, *Sabatino v. Liberty Life*

17   *Assurance Co. of Boston*, 286 F. Supp. 2d 1222, 1231 (N.D. Cal. 2003) ("Plaintiff was employed

18   as an engineer, which may be a sedentary occupation, but one that requires careful thought and

19   concentration.").  Even assuming without deciding that Plaintiff could have worked in a sedentary

20   occupation in October 2010, that required merely sitting and viewing objects in front of her, this

21   is not an accurate description of her job duties as a senior loan officer.  It is reasonable to infer

22   that Plaintiff's doctors indicated that the stress of her occupation was an integral part of her

23   position which she was no longer able to perform given the effect on her eyesight and headaches.

24   Therefore, the Court finds Defendants' argument that Plaintiff's symptoms were caused by mere

25   stress and not her medical condition unpersuasive.

26        22.    **Nurse Gillis and Dr. LoCascio:**  Additionally, the Court finds Nurse Gillis and

27   Dr. LoCascio's initial denial of Plaintiff's claim is highly suspect.  It appears that Nurse Gillis

28   was initially inclined to approve Plaintiff's claim for long-term disability, as she acknowledged

that Plaintiff's reported symptoms were consistent with her restrictions.[28]   Prudential went so far as to schedule two years of disability payments from March 2011 to March 2013.  This two-year period corresponds exactly to the two-years' worth of long-term disability payments set forth in the policy when an employee is found to be disabled from his or her regular occupation.  (*See* PRU001330.)

23.     Moreover, Prudential told Plaintiff on at least two occasions that her long-term disability claim was going to be approved.  (PRU001211, 1214.)  Consistent with this approval, Prudential contacted Plaintiff to offer her vocational services to facilitate her eventual return to work.[29]   It was only after Plaintiff's claim was sent for further review that Dr. LoCascio became involved.  Plaintiff argues that Dr. LoCascio's further review was necessary because the claim exceeded some monetary authority amount; tellingly, Defendants do not dispute this explanation.

24.     The tenor of Nurse Gillis's full file review also is markedly different than her initial review, and she reports several superficial or non-existent inconsistencies.  For example, in effort to discredit Dr. Huddleston's opinion that Plaintiff was disabled, Nurse Gillis criticized Dr. Huddleston's failure to follow up with Plaintiff after his initial consult in March 2010 until September 2010.  This is a distortion of the truth.  Plaintiff correctly notes that Dr. Huddleston was in the radiation oncology department, and Plaintiff was receiving regular radiation treatments from March 2010 to May 2010.  Plaintiff also consulted with Dr. Valicenti, an attending

---

[28] From the Court's own review of the administrative record, it was Nurse Gillis who initially concluded that Plaintiff was likely disabled.  Although Plaintiff attributes this assessment to a different Prudential employee, the SOAP notes indicate that it was Nurse Gillis who first made the initial disability assessment in an addendum.  (*See* PRU001162–64.)

[29] Defendants argue that Prudential's offer of vocational services to assist is not probative of whether they determined she was disabled.  Defendants contend that they offered vocational services to Plaintiff regardless of disability because Plaintiff indicated she was working with her manager to determine another role within her company.  (ECF No. 51 at 7:1-10.)  Defendants' assertion, however, is belied by Prudential's vocational specialist himself who referred several times in his letter to Plaintiff's "disability."  (*See* PRU001140.)  Furthermore, as soon as Prudential determined that Plaintiff was not disabled, Prudential withdrew its offer of vocational services.  (PRU001140 ("[Return to work] not appropriate given determination of liability. . . . As [employee] is not considered disabled from own occupation and no liability has been established, continuation of any [return to work] services is not appropriate.").)  Therefore, Prudential's offer to provide vocational assistance supports this Court's finding that Prudential originally determined that Plaintiff was disabled.

1   physician in radiation oncology, in June 2010.

2       25.    Nurse Gillis also stated that Plaintiff did not consistently report headaches.  This is

3   demonstrably false for two reasons.  First, Plaintiff complained as early as 2009 of headaches and

4   blurry vision.  Second, Plaintiff has reported "intermittent headaches" from the outset of her

5   diagnosis.  Therefore, one would not expect the frequency and severity of her headaches to be

6   uniform.

7       26.    Although Nurse Gillis correctly identified that Plaintiff was not taking prescription

8   medication for her headaches, this does not necessarily weigh in the Defendants' favor.  In 2009

9   and 2010, Plaintiff had consistently opined that her headaches were intermittent and triggered by

10  computer use.  Furthermore, Plaintiff reported at least twice that she preferred not to take

11  prescription painkillers due to their effect on her.  Indeed, Plaintiff was seeing a natural solutions

12  physician, Dr. Larrow.  Under Defendants' view, Plaintiff's pain would have to be steady and

13  debilitating from the outset throughout the elimination period in order to qualify as disabled under

14  its policy.  The Ninth Circuit, however, has soundly rejected this view.  *Silver*, 466 F.3d at 736

15  ("We do not view the Policy as requiring Silver to have needed angioplasty on each of the ninety

16  days during his elimination period; rather, we construe it as requiring Silver to demonstrate,

17  consistent with its plain language, that he could not perform the material tasks of his job during

18  this 90–day period because of his serious heart condition —a condition that [defendant] itself

19  acknowledges had been disabling.")

20      27.    Furthermore, Nurse Gillis emphasized that Plaintiff was still driving during the

21  day.  However, it is undisputed that Plaintiff's position required her to drive at night as clients

22  often desire to meet with loan officers after business hours.  Moreover, Plaintiff's statement of

23  disability and initial doctors' notes from radiation oncologist noted that her restriction was driving

24  at night.  While it is true that courts may consider whether an employee has engaged in

25  recreational and life activity inconsistent with her claim of disability, the Court finds that

26  Plaintiff's diagnosis is consistent with her limited driving ability.

27      28.    Similarly, the Court finds that Dr. LoCascio is not a credible witness as to

28  Plaintiff's disability.  There is no evidence that Dr. LoCascio was a specialist in neurology,

51

ophthalmology, or radiation oncology at the time he rejected the opinions of Dr. Valicenti, Dr. Huddleston, and Dr. Keltner, and the initial view of Nurse Gillis. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003) (noting that specialists may have expertise that a treating physician lacks). Furthermore, Plaintiff correctly notes that Dr. LoCascio never read any of Plaintiff's records. (ECF No. 46 at 42:11–13.) Rather he reviewed summaries of Plaintiff's records and Prudential SOAP notes only.

29.     Prudential's credibility in this case is further dubious given its utter failure to address the reasons prompting Dr. LoCascio's further review in its briefing. Accordingly, the Court finds that Nurse Gillis and Dr. LoCascio's exchange was more likely than not a result-oriented review to find inconsistencies in Plaintiff's claim and to deny the claim for Prudential's financial gain.

30.     **Examining Physicians vs. Paper File Physicians:**  The Court finds that Plaintiff's physicians are more credible in this particular case. In *Salomaa,* the plaintiff was personally examined by at least four physicians as well as two psychologists, who all concluded that the plaintiff was totally disabled by his physical condition. *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666 (9th Cir. 2011). The only physicians to conclude that plaintiff was not disabled were the physicians who were paid by the defendant's insurance company who conducted paper reviews. Furthermore, the defendant in *Salomaa* opted not to conduct an independent medical exam, even after the plaintiff's attorney offered to make plaintiff available for one.

31.     Similar to *Salomaa*, Plaintiff's doctors unanimously determined that she was disabled from her own occupation, including several doctors from UC Davis radiation oncology, and Dr. Keltner a neuro-ophthalmologist. While Defendants are correct that the Supreme Court has rejected a per se rule requiring special deference to treating physicians, there is no dispute that the Federal Rules of Evidence permit a fact-finder to credit witnesses' testimony who were in a better position to observe the things testified to. *See* 9th Cir. Model Jury Instruction 1.11 ("In considering the testimony of any witness, you may take into account . . . the opportunity and ability of the witness to see or hear or know the things testified to[.]"); *see also Hawkins v. First*

1  *Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 917 (7th Cir. 2003) ("If the incentives of

2  the treating physician and of the plan's consultant are assumed to be equal and opposite,

3  consideration of incentives drops out and the superior information likely to be possessed by the

4  treating physician, especially when as in this case the consultant does not bother to examine the

5  patient . . . ."). This Court credits the views of the several physicians who treated Plaintiff and

6  examined her during the disability/elimination period as opposed to physicians who never

7  examined her, provided only file review upon the insurance company's request, and in at least

8  some cases, were non-specialists.[30]

9       32.   **Lack of IME:**  A district court may consider, as a factor, an administrator's

10  decision to conduct a "pure paper" review of the claimant's medical records rather than to

11  conduct an in-person medical evaluation of him. *See, e.g.*, *Salomaa*, 642 F.3d at 666. While

12  Prudential's plan does not require an IME, the lack of an IME in this case where the veracity of

13  Plaintiff's symptoms are disputed is suspect. For example, if Defendants disputed the extent of

14  Plaintiff's vision issues, a physician could have Plaintiff examined "to determine the quality of

15  her vision in low-light settings." (ECF No. 46 at 48:15–16.)

16       33.   A representative from the New Jersey Department of Insurance apparently agreed

17  that the lack of an IME was unusual, as confirmed by his call to Prudential after it denied

18  Plaintiff's claim. While a general inquiry by the department of insurance at the Plaintiff's

19  prompting is far from dispositive, the representative's inquiry is nonetheless pertinent.

20       34.   **Brain Surgery:** Most compelling to the Court is evidence that Plaintiff's

21  condition continued to deteriorate after the elimination period, requiring brain surgery and

22  resulting in increased severity of Plaintiff's symptoms. Notably, Plaintiff's symptoms after her

23  elimination period – headaches, hearing loss, muscle spasms – were consistent with her reported

24  symptoms during her elimination period, just with increased severity and frequency.

25       35.   **Dr. Collins:**  Furthermore, the Court also agrees with Plaintiff that Dr. Collins's

26  concession that Plaintiff was disabled for any period of time constitutes powerful evidence of

27  ───────────────

28  [30] Furthermore, Plaintiff's doctors include attending physicians at renowned teaching hospitals. Defendants do not dispute these accolades which also weigh in Plaintiff's favor.

1    Plaintiff's disability during the elimination period.  The effect of this concession is somewhat

2    diluted by Dr. Collins expressly limiting his opinion to a specific period of time.  However, Dr.

3    Collins's confirmation that Plaintiff was disabled in 2011 and 2012 provides support for her other

4    physicians' conclusions that she was disabled in 2010.  *See Silver*, 466 F.3d at 735–36 ("While

5    there may have been no acute episode during elimination, the subsequent record clearly

6    demonstrating continuing disability due to precisely the same degenerative  cardiac disease makes

7    [defendant's] position untenable.").

8         36.    **Dr. Neuren:**  The Court also finds the circumstances and content of Dr. Neuren's

9    report suspect, particularly after Prudential had already engaged a third-party company MLS to

10   provide a neurological opinion by Dr. Collins.  Defendants argue that it was reasonable for

11   Prudential to request an additional neurological opinion from the initial date of alleged disability

12   in October 2010.  However, Plaintiff correctly notes that Dr. Collins had already provided a

13   neurological opinion from Plaintiff's initial date of disability in October 2010.  No further reason

14   is provided as to why Dr. Neuren's opinion was required after Dr. Collins had already provided

15   one.

16        37.    Additionally, the Court agrees with Plaintiff that it is suspect that Prudential

17   provided the SSA report to Dr. Neuren but not to Dr. Collins.  (ECF No. 46 at 31:9–12 ("Dr.

18   Neuren was called back into service to attempt to rebut [the SSA's] decision.  Plaintiff is

19   obligated to point out here that Dr. Collins was not used for this purpose, although his

20   disappearance from the file is hardly surprising.").)  This omission is glaring given that Dr.

21   Collins was repeatedly touted as being an impartial third party physician but Dr. Neuren is

22   admittedly an internal physician at Prudential.  This further discredits Dr. Neuren's analysis.

23        38.    Dr. Neuren's most egregious opinion was his purported analysis of the SSA's

24   decision in Plaintiff's favor.  Upon appeal, the SSA concluded that Plaintiff was disabled under

25   its definition.  In doing so, the SSA set forth its formulaic multi-step process to determine

26   disability.  At the fourth step, the SSA considers whether an individual suffers from a disability so

27   debilitating as to not require further inquiry into the specifics of the job.  Relying on its internal

28   neurologist Dr. Neuren, Prudential argued that there were no objective findings to meet the listed

1   impairments for the SSA and that no treating physician found severity of symptoms.  As Plaintiff

2   points out, these sentences are a gross mischaracterization of the SSA decision.  The SSA merely

3   found that there were no objective findings that would qualify Plaintiff for an automatic disability

4   determination without examining her job duties.  *See* 20 C.F.R. Part 404, Subpart P, Appendix 1.

5   However, the SSA decision goes on to find Plaintiff fully disabled for ***any*** occupation not just her

6   regular occupation.  Defendants do not quote from the remaining sections of the SSA letter which

7   detail the reasons why the SSA considers Plaintiff disabled.  Therefore, the Court finds that it is

8   more probable than not that Dr. Neuren's opinion was solicited to bolster the decision that

9   Plaintiff was not disabled after Dr. Collins had conceded that she was.

10      39.   **Credibility:** The Court acknowledges the difficult task of administrators who must

11   weigh evidence as they receive it and determine the credibility of disability claimants.  For

12   example, the Court acknowledges that records of Plaintiff's numerous medical visits may not

13   have been available immediately to Prudential during its initial claim review.  However, because

14   this Court reviews Prudential's determination of disability de novo, rather than for an abuse of

15   discretion, the timing of disclosure of records does not affect the Court's analysis, given that these

16   records eventually became available to Prudential during the appeal process.  Furthermore,

17   regardless of when Prudential received Plaintiff's medical information, Prudential at all times

18   retains its duty to administer benefits in accordance with its plan.  *See* 29 C.F.R. § 2560.503-

19   1(h)(2)(iv) (providing that "claims procedures [must] [p]rovide for a review that takes into

20   account all comments, documents, records, and other information submitted by the claimant

21   relating to the claim, without regard to whether such information was submitted or considered in

22   the initial benefit determination").

23      40.   Despite this difficulty for administrators, the Court finds Plaintiff is a credible

24   witness.  The administrative record discloses that Plaintiff worked successfully as a loan officer

25   for 16 years at PHH and for several years before that for a different company; she worked during

26   her radiation treatments prior to submitting her claim for disability; she received letters of support

27   from her physicians and her assistant; and she communicated with her employer regarding

28   modification of her duties so that she could continue to work.  This is precisely the employee to

1    whom ERISA should apply.  *See Conkright v. Frommert*, 559 U.S. 506, 516–17 (2010) (internal

2    citations and quotation marks omitted) ("Congress enacted ERISA to ensure that employees

3    would receive the benefits they had earned[.]").

4         41.     Therefore, based on the administrative record, the detailed considerations set forth

5    in this order, and binding Ninth Circuit precedent, the Court finds Plaintiff is disabled from

6    working in her regular occupation within the meaning of Prudential's policy during the applicable

7    time period.

8         42.     **Pre-Judgment Interest**:  A district court may award prejudgment interest on an

9    award of ERISA benefits in its discretion.  *Blankenship v. Liberty Life Assur. Co. of Boston*, 486

10   F.3d 620, 627–28 (9th Cir. 2007).  "Generally, 'the interest rate prescribed for post-judgment

11   interest under 28 U.S.C. § 1961 is appropriate for fixing the rate of pre-judgment interest unless

12   the trial judge finds, on substantial evidence, that the equities of that particular case require a

13   different rate.'"  *Grosz–Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154, 1164 (9th Cir.

14   2001) (quoting *Nelson v. EG & G Energy Measurements Group, Inc.*, 37 F.3d 1384, 1391 (9th

15   Cir. 1994)).  Here, the parties have provided no information let alone substantial evidence with

16   respect to the interest rate; therefore the amount shall be at the interest rate prescribed in 28

17   U.S.C. § 1961.

18        43.     **Remand**:  Defendants request that the Court remand the action back to the

19   administrator to determine whether Plaintiff is disabled under the more expansive definition of

20   any gainful occupation.  (ECF No. 44 at 31:26–32:3 ("If, however, the Court determines that

21   Plaintiff was disabled as of October 15, 2010, and continued to be disabled throughout the

22   elimination period, benefits should only be awarded to April 15, 2013, after which time the

23   definition of disability in the Plan changes to require that Plaintiff be 'unable to perform the

24   duties of any gainful occupation. . . .'").)  Plaintiff does not address this contention in her

25   briefing.  Because the administrator has not had the opportunity to consider whether Plaintiff is

26   disabled under its definition for any gainful occupation, the Court agrees that remand is

27   appropriate.  *See, e.g.*, *Mongeluzo v. Baxter Travenol Long Term Disability Ben. Plan*, 46 F.3d

28   938 (9th Cir. 1995).

### III.   CONCLUSION

For the foregoing reasons, the Court HEREBY ORDERS:

1.  Plaintiff's Motion for Judgment under Rule 52 (ECF No. 46)  is GRANTED;

2.  The Court finds that Plaintiff is disabled under the "regular occupation" definition in Prudential's policy retroactive to October 15, 2010;

3.  The Court REMANDS this action back to the administrator to consider whether Plaintiff is disabled from working in any "gainful occupation" under the applicable policy;

4.  Defendants' Motion for Judgment (ECF No. 44) is granted only insofar as the Court shall remand this action back to the administrator; in all other respects, the Court DENIES Defendants' Motion;

5.  The parties shall meet and confer as soon as practicable for the purpose of providing the Court with an accounting to determine the amounts owed to Plaintiff in a proposed amended judgment to be filed within 14 days of entry of this Order.

**IT IS SO ORDERED.**

Dated: July 14, 2014

Troy L. Nunley
United States District Judge

57